COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, Beales and Alston
Argued at Richmond, Virginia

PUBLISHED

MICHAEL ANTHONY EDWARDS

v.        Record No. 0902-16-2

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE ROSSIE D. ALSTON, JR.
DECEMBER 19, 2017

FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Steven C. McCallum, Judge

Gregory R. Sheldon (Bain Sheldon, PLC, on brief), for appellant.

J. Christian Obenshain, Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.

Michael Edwards ("appellant") appeals his murder conviction from the Circuit Court of

Chesterfield County ("trial court"), where a jury convicted him of killing Leyla Namiranian.  On

appeal, appellant asserts that the trial court erred by (1) denying his motion to dismiss for

improper venue, and (2) finding sufficient evidence to support his conviction.  We find that the

trial court did not err and affirm.

BACKGROUND

Leyla Namiranian ("Namiranian") was last seen alive on April 4, 2012.  That evening,

she hosted her friend Peter Paoli for dinner.  Namiranian was unusually anxious throughout the

entire evening, frequently checking her cell phone and looking out the front door of her home.

Namiranian and Paoli ate dinner, exchanged gifts, and became intimate with each other.  At

around 9:45 p.m., a neighbor observed a silver Cadillac driven by a "football-player type"

African-American male quickly reverse out of Namiranian's driveway.  When Paoli later

departed at around 11:00 p.m., Namiranian was alive and well.

At around 5:15 a.m. on April 5, a neighbor walking his dogs noticed a large, African-American male in Namiranian's front yard. A little more than an hour later, between 6:15 and 6:30 a.m., another neighbor heard two brief, high-pitched noises sounding like screams come from the direction of Namiranian's house. Namiranian never showed up for work on April 5, so a coworker began periodically calling her cell phone to check on her. The coworker testified that on some calls the phone would ring several times, and on other calls, it would only ring once and then transition to voicemail. After several failed attempts to get in contact with Namiranian, the coworker became very concerned and contacted the police.

When the police arrived at Namiranian's house, nothing in particular indicated that a crime had occurred. The front door of the house was locked, no evidence of any forced entry was observed, and Namiranian's car was parked in the garage. Inside the house, there were no signs of a struggle – nothing was broken or knocked over, and everything seemed in its proper place. An investigation conducted by the police established that Namiranian was leading a completely normal life, and was not planning any trips or moving from the area. Her mailbox contained several envelopes, and Namiranian's two cats were in the house. She had tickets for an upcoming event in Washington, D.C. All of Namiranian's personal items were in various rooms, including her car keys, work bag, glasses, pills, hairbrush, and toothbrush. Her passport, social security card, and citizenship documents were filed away in her home office. However, the police did not find Namiranian's two cell phones.

Further investigation by the police began yielding interesting details. Namiranian kept two couches in her living room – one had a large, red blanket draped over it, the other did not. However, the couch without a blanket had a rectangular discoloration across the cushions. Additionally, Namiranian's journal was found in her work bag, and it contained several entries about her tumultuous relationship with appellant.

Namiranian's friend, Kimberly Pugh, testified about the history between Namiranian and appellant. According to Pugh, the relationship began well but unraveled due to appellant's possessive and violent nature. Eventually, Namiranian broke it off. During an altercation in February 2012, appellant choked Namiranian and threw her to the ground. Significantly, Namiranian noted in her journal that she then ended the relationship permanently. Namiranian wrote:

> I'm going between fear and anger. I broke up with [appellant] for the fourth and last time yesterday. He lost his mind with jealousy in trying to choke me, but gave up. Thank God. I was never so scared . . . I slept at Kim's because I was afraid he'd come back. Today I called – she called somebody – so he would stop calling me, or thinking we would somehow get back together.

Appellant had once told Namiranian "one day, I'm gonna get you. Somehow, some way, when you least expect it, I'm gonna get you." Appellant would show up at Namiranian's house without warning, and Namiranian developed a significant fear of him. Neighbors also observed him sitting in his car near her house on another occasion before her disappearance.

Appellant's phone records revealed that between April 2 and April 4, the days leading up to Namiranian's disappearance, appellant called Namiranian eight different times, none of which Namiranian answered or returned. The records also revealed that appellant did not call Namiranian on April 5, April 6, or any other day after that.

Appellant exhibited unusual behavior and demeanor on April 5. He reported late to work at his job at Vitran Express in Ashland, Virginia, located off of Interstate 95. Appellant's supervisor testified that he called appellant between 12:00 and 1:00 p.m. that day because appellant had not yet arrived, and appellant appeared upset and exhausted when he finally reported at around 2:00 p.m. Additionally, appellant's friend Carla Hargrove had attempted to call him multiple times on the morning of April 5, but received no answer. Appellant called her

back later that night, and told her to pretend that she had been with him during the morning of April 5, should anyone ask her.

The police wanted to speak with appellant about Namiranian, but appellant declined the opportunity. He refused to tell the police where he worked and then refused to meet in person. Appellant finally agreed to talk with the police during the afternoon of April 6. He initially denied being near Namiranian's house on April 4 or April 5. However, once detectives showed him his cell phone records proving he was in that vicinity, he admitted to being around Namiranian's house and leaving his car on her street overnight. A forensic analysis of his cell phone revealed that he had deleted all of his text messages to Namiranian. Forensic technicians recovered the messages, and one message from April 2 read "please don't see him again. Okay. Love you very much. Love you very, very much. I'm sorry," suggesting appellant's jealousy of Namiranian's current relationship. Appellant was also inconsistent with other details from the previous two days, providing four different times at which he had reported to work on April 5.

The police searched appellant's vehicle and found a bag in the trunk, containing a red blanket, duct tape, and a bucket. They also found various cleaning supplies. Further analysis of the blanket and bag revealed a hair consistent with Namiranian's hair color, and another hair found in the trunk was consistent with her DNA profile. Police then searched the car with a canine trained to detect human remains, which sniffed the inside of the trunk and then alerted his handler to the presence of human remains. Police also found multiple blood stains in the trunk.

The police thoroughly reviewed the cell phone records from appellant and Namiranian and concluded that both individuals were near or inside Namiranian's house during the night of April 4 and throughout the morning of April 5. Both phones had pinged off a tower[1] close to

---

[1] "Pinging" occurs when a cell phone connects to a local cell tower and then links with the cellular network, allowing the phone's user to make calls, send or receive text messages, and

Namiranian's house during that time frame. Moving into the early afternoon of April 5, both phones pinged to towers located away from her house. By around 2:00 p.m., both phones pinged off a tower north of appellant's home, adjacent to Interstate 95. Appellant's pinged to the tower near his work around 2:00 p.m., and around the same time Namiranian's phones pinged to towers close to a section of Interstate 95. The phones were found shattered and in several pieces in the woods near the Atlee/Elmont exit.

The police continued investigating whether Namiranian was still alive somewhere, but since April 4, 2012, all of her email, social media, and financial and credit accounts have remained inactive, she never checked into any hospital in the Chesterfield County area, her name never appeared on any flight manifests, and her passport was never logged at any airport. Eventually, the authorities concluded that Namiranian is deceased, despite never finding her body, and charged appellant with her murder.

At appellant's five-day jury trial, the Commonwealth called 31 witnesses to establish its case. Ultimately, the jury convicted appellant of second-degree murder and recommended a 30-year penitentiary sentence that the trial court imposed. This appeal followed.

ANALYSIS

I. The Trial Court Did Not Err in Denying Appellant's Motion to Dismiss

In his first assignment of error, appellant argues that the trial court erred by denying his motion to dismiss the indictment because the Commonwealth did not prove that Chesterfield County was the proper venue for this case. We disagree.

On appeal, we review "whether the evidence, when viewed in the light most favorable to the Commonwealth, is sufficient to support the [trial court's] venue findings." Williams v.

---

access the Internet. When analysts determine which tower a phone connected with, they are able to approximate a location of the phone.

Commonwealth, 289 Va. 326, 336, 771 S.E.2d 675, 680 (2015) (quoting Cheng v.

Commonwealth, 240 Va. 26, 36, 393 S.E.2d 599, 604 (1990)). The burden is on the

Commonwealth to establish venue. Ware v. Commonwealth, 214 Va. 520, 522, 201 S.E.2d 791,

793 (1974). Evidence on venue is viewed in the light most favorable to the Commonwealth, and

it must give rise to a "strong presumption that the offense was committed within the jurisdiction

of the court." Meeks v. Commonwealth, 274 Va. 798, 802, 651 S.E.2d 637, 639 (2007) (citation

omitted).

> The failure to clearly prove venue is usually due to inadvertence,
> flowing naturally from the familiarity of court, counsel, witnesses,
> and jurors with the locality of the crime; therefore, this Court will
> generally and properly lay hold of and accept as sufficient any
> evidence in the case, direct or otherwise, from which the fact may
> be reasonably inferred.

Williams, 289 Va. at 336, 771 S.E.2d at 680 (quoting Randall v. Commonwealth, 183 Va. 182,

187, 31 S.E.2d 571, 573 (1944)).

Here, the applicable venue statute is Code § 19.2-248, which provides, in relevant part,

that "if a mortal wound, or other violence or injury, be inflicted . . . and death ensues therefrom

in another county or city, the offense may be prosecuted in either."[2] Appellant argues that the

Commonwealth failed to prove that Chesterfield County was a proper venue for his trial. We

note that the Commonwealth can establish venue using either direct or circumstantial evidence.

Foster-Zahid v. Commonwealth, 23 Va. App. 430, 442, 477 S.E.2d 759, 765 (1996). In this

---

[2] We note that the Commonwealth relied on Code § 19.2-244 at trial and oral argument, which provides, in relevant part, that "the prosecution of a criminal case shall be had in the county or city in which the offense was committed." We find that Code § 19.2-248 is more applicable. Moreover, proceeding under Code §§ 19.2-244 or -247 would have required the various jurisdictions involved in this case to collaborate with one another to formalize a set theory on the factual circumstances of the case, because neither Code §§ 19.2-244 nor -247 contain the geographical flexibility found within Code § 19.2-248. The record does not reflect that any discussion between the jurisdictions ever occurred.

case, the Commonwealth relied on circumstantial evidence to establish Chesterfield County as a proper venue.

On the last day she was seen alive, April 4, 2012, Namiranian hosted a friend for dinner at her house in Chesterfield County. Cell phone tower evidence showed that appellant was around Namiranian's house for several hours between the night of April 4 and the morning of April 5. Namiranian's neighbors noticed appellant's car parked outside the house, and he admitted the same to the police. One neighbor noticed an individual fitting appellant's description in Namiranian's front yard in the early morning of April 5. Another neighbor heard noises sounding like screams come from the direction of Namiranian's house shortly thereafter. By the afternoon of April 5, both Namiranian's and appellant's cell phones pinged from towers located away from the house. Namiranian's phones were found discarded on the side of Interstate 95. Inside Namiranian's house, police found all of her personal belongings, including her luggage, passport, glasses, purse, and car keys, and even her cats were still there. When police searched appellant's car, a canine alerted police to the presence of human remains, blood stains were noticeable in the trunk, and they found a blanket that had a hair on it matching Namiranian's hair color. Although police recovered no blood or hair evidence from inside the house, appellant had a bucket and cleaning supplies in his car, suggesting that he wrapped up Namiranian's body in the blanket, and thoroughly cleaned the house to erase any evidence of the murder.

Based on the evidence presented, the Commonwealth established a strong inference that on the night of April 4, appellant went into Namiranian's house in Chesterfield County for several hours and either mortally wounded or murdered her there,[3] and then disposed of her body

---

[3] We recognize that venue would be established under Code § 19.2-248 if *any* violence leading to Namiranian's death occurred within the home, no matter how minor. Thus, our analysis does not purport to diminish Code § 19.2-248's applicability in other cases with

elsewhere.  With all reasonable inferences drawn in the light most favorable to the

Commonwealth, the evidence was sufficient under Code § 19.2-248 to establish venue in

Chesterfield County.

For the foregoing reasons, the Commonwealth met its burden of proof regarding venue in

this case and the trial court did not err in denying the motion to dismiss.

## II.  The Evidence Was Sufficient to Convict Appellant of Murder

In his second assignment of error, appellant argues that the evidence was insufficient to

prove that appellant murdered Namiranian and that the Commonwealth did not exclude every

reasonable hypothesis of innocence.  We disagree.

## A.  Circumstantial Evidence

When the sufficiency of the evidence is challenged on appeal, we review the evidence "in

the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly

deducible therefrom."  Kelly v. Commonwealth, 41 Va. App. 250, 254, 584 S.E.2d 444, 446

(2003) (*en banc*) (quoting Bright v. Commonwealth, 4 Va. App. 248, 250, 356 S.E.2d 443, 444

(1987)).  "In so doing, we must discard the evidence of the accused in conflict with that of the

Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and

all fair inferences that may be drawn therefrom."  Watkins v. Commonwealth, 26 Va. App. 335,

348, 494 S.E.2d 859, 866 (1998) (quoting Cirios v. Commonwealth, 7 Va. App. 292, 295, 373

S.E.2d 164, 165 (1988)).  This Court will "presume the judgment of the trial court to be correct

and reverse only if the trial court's decision is plainly wrong or without evidence to support it."

Kelly, 41 Va. App. at 257, 584 S.E.2d at 447.

---

different facts.  In this case, however, we believe that the Commonwealth's evidence showed
that Namiranian was likely killed within her home.

"Murder at common law is a homicide committed with malice, either express or implied." Tizon v. Commonwealth, 60 Va. App. 1, 11, 723 S.E.2d 260, 265 (2012) (quoting Pugh v. Commonwealth, 223 Va. 663, 667, 292 S.E.2d 339, 341 (1982)). "Malice inheres in the 'doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will.'" Id. (quoting Dawkins v. Commonwealth, 186 Va. 55, 61, 41 S.E.2d 500, 503 (1947)). In proving that a crime occurred, "[t]here is no distinction in the law between the weight or value to be given to either direct or circumstantial evidence. The finder of fact is entitled to consider all of the evidence, without distinction, in reaching its determination." Commonwealth v. Hudson, 265 Va. 505, 512-13, 578 S.E.2d 781, 785 (2003). And "[w]hile no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances . . . may lead a reasonable mind irresistibly to a conclusion." Muhammad v. Commonwealth, 269 Va. 451, 479, 619 S.E.2d 16, 32 (2005).

We begin our analysis by recognizing that no law exists in Virginia requiring the Commonwealth to produce a victim's dead body to obtain a conviction for murder. See Epperly v. Commonwealth, 224 Va. 214, 229-30, 294 S.E.2d 882, 890-91 (1982).[4] In this case, Namiranian's body was never found, but the Commonwealth presented substantial and probative circumstantial evidence to establish beyond a reasonable doubt that appellant had motive and opportunity to murder and that he carried out the murder of Namiranian.

---

[4] Virginia is part of the majority of jurisdictions that follow this principle. See, e.g., Gov't of Virgin Islands v. Harris, 938 F.2d 401 (3d Cir. 1991); Nebraska v. Edwards, 767 N.W.2d 784 (Neb. 2009); Arizona v. Hall, 65 P.3d 90 (Ariz. 2003); Michigan v. Fisher, 483 N.W.2d 452 (Mich. Ct. App. 1992); Illinois v. Faulkner, 542 N.E.2d 1190 (Ill. App. Ct. 1989); Pennsylvania v. Smith, 588 A.2d 600 (Pa. 1989); Ohio v. Nicely, 529 N.E.2d 1236 (Ohio 1988); Rawlings v. Oklahoma, 740 P.2d 153 (Okla. Crim. App. 1987); Hurley v. Maryland, 483 A.2d 1298 (Md. Ct. Spec. App. 1984); Utah v. Rebeterano, 681 P.2d 1265 (Utah 1984); California v. Manson, 139 Cal. Rptr. 275 (Cal. Ct. App. 1977); New Jersey v. Zarinsky, 362 A.2d 611 (N.J. Super. Ct. App. Div. 1976); Washington v. Lung, 423 P.2d 72 (Wash. 1967).

Namiranian and appellant had a mercurial romantic past. Namiranian eventually became scared of appellant, and this fear escalated to the point of an actual physical confrontation in which appellant choked Namiranian. After that incident, Namiranian resolved to end her relationship with appellant, but appellant found it difficult to move on. Namiranian told her friend Kimberly Pugh that appellant had once threatened her, stating "one day I'm gonna get you. Somehow, some way, when you least expect it, I'm gonna get you."

Namiranian's personal journal contained various statements exhibiting Namiranian's fear of appellant. In a journal entry from February 19, 2012, Namiranian wrote:

> I'm going between fear and anger. I broke up with [appellant] for the fourth and last time yesterday. He lost his mind with jealousy in trying to choke me, but gave up. Thank God. I was never so scared . . . I slept at Kim's because I was afraid he'd come back. Today I called – she called somebody – so he would stop calling me, or thinking we would somehow get back together.

Appellant's cell phone records showed that in the days leading up to Namiranian's disappearance, appellant attempted to contact Namiranian almost every day, but stopped after April 4, the last day she was ever seen. On April 2, appellant had sent Namiranian a text saying "[P]lease don't see him again. Okay. Love you very much. Love you very, very much. I'm sorry." Clearly, appellant knew Namiranian was involved with another man but was unable to move on from her, supplying him with the motive to murder Namiranian.

Appellant also had the opportunity to murder Namiranian. A significant amount of evidence placed appellant near Namiranian's house between April 4 and April 5. Appellant's cell phone records showed that his phone pinged off a tower near Namiranian's house during the night of April 4 and throughout the morning of April 5. When appellant's cell phone finally left the area near Namiranian's house late in the morning on April 5, Namiranian's cell phones moved along with his, pinging off of the same towers. Namiranian's neighbors testified that they saw appellant's car in the area on April 4, and he admitted that it was parked there that night.

Another neighbor witnessed an African-American male, "about 6'2", 250 pounds, a big man," walking across Namiranian's lawn early in the morning on April 5.[5] Appellant admitted to the police that he had access to Namiranian's house, explaining the lack of evidence of any forced entry. It was also around early morning on April 5 that another neighbor heard two loud, high-pitched screams emanate from the direction of Namiranian's house.

In the early afternoon of April 5, appellant showed up late to work without explanation and appeared exhausted and upset. Appellant worked at a building close to Interstate 95, affording him the opportunity to dump Namiranian's phones out his car window on the way there. The shattered cell phones were recovered in several pieces, strewn alongside Interstate 95. Later that night, appellant spoke to his friend Carla Hargrove over the phone, and asked her to tell anyone who inquired that they had been together that day, in a clear attempt to formulate an alibi for his whereabouts.

Additionally, while several canine searches of Namiranian's house and the surrounding area did not produce any leads, the police eventually found more evidence implicating appellant. During a search of appellant's car, a canine alerted to the presence of human remains in the trunk, a hair matching Namiranian's hair color was recovered from a red blanket, and another hair corresponding to Namiranian's DNA profile was recovered from the trunk. The police also observed blood stains in the trunk, and a roll of duct tape in the backseat had traces of male and female DNA on it.

Within Namiranian's house itself, the police observed that she owned two couches – one had a large, red blanket draped over the top, while the second did not. However, a close

---

[5] While we normally would not repeatedly reference a perpetrator's ethnicity, we believe it prudent here because the Commonwealth relied exclusively on circumstantial evidence in this case, and thus it is highly material that on April 4 and April 5, the time frame during which the Commonwealth alleged the murder occurred, Namiranian's neighbors observed an individual fitting appellant's description both in ethnicity and physical build.

inspection of the second couch revealed a noticeable, rectangular discoloration, indicating that something rectangular-shaped had been sitting on it for a long period of time, protecting the fabric from light. A reasonable jury could conclude that the second couch had an identical large, red blanket draped over it, which appellant removed and used during the disposal of Namiranian's body. A red blanket was recovered from the trunk of appellant's car. Moreover, police discovered a bucket and various cleaning supplies in appellant's car, suggesting to a reasonable factfinder that appellant had undertaken the task of cleaning up any evidence of the murder before departing from the house.

Finally, considering the totality of the evidence, it is clear that appellant displayed express malice in killing Namiranian. "Express malice is evidenced when 'one person kills another with a sedate, deliberate mind, and formed design.'" Canipe v. Commonwealth, 25 Va. App. 629, 642, 491 S.E.2d 747, 753 (1997) (quoting Essex v. Commonwealth, 228 Va. 273, 280, 322 S.E.2d 216, 220 (1984) (citation omitted)). Appellant demonstrated a significant feeling of "ill will" toward Namiranian through a series of statements and actions. See Tizon, 60 Va. App. at 11, 723 S.E.2d at 265. He had previously threatened Namiranian, stating "I'm gonna get you." He choked Namiranian and threw her on the ground during the February 2012 altercation, and his April 2 text message to her revealed his enduring jealousy over her new relationship. Appellant then lurked around Namiranian's house on the night of April 4, biding his time until he could catch her alone and off-guard. Furthermore, appellant's act of wrapping Namiranian's body in a blanket and disposing of it so that it would never be found indicates a knowledge that his actions were "without just cause or excuse." Id. The decisive and calculated methods employed by appellant evince his "formed design" of the murder. See Canipe, 25 Va. App. at 642, 491 S.E.2d at 753. Appellant ensured that Namiranian's body would never be found, and he attempted to eliminate all physical evidence of the murder by cleaning

- 12 -

Namiranian's house, undercutting the possibility that appellant killed Namiranian accidentally. In that vein, we note that nothing within the Commonwealth's evidence suggested that the killing may have been accidental.

For the aforementioned reasons, we find that the Commonwealth's evidence was sufficient to prove that appellant committed second-degree murder.

### B. The Jury Rejected Appellant's Hypothesis of Innocence

Appellant also argues that the Commonwealth did not exclude every reasonable hypothesis of innocence, and thus he cannot be convicted of second-degree murder. "The statement that circumstantial evidence must exclude every reasonable theory of innocence is simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt." Hudson, 265 Va. at 513, 578 S.E.2d at 785. However, "[m]erely because [a] defendant's theory of the case differs from that taken by the Commonwealth does not mean that every reasonable hypothesis consistent with his innocence has not been excluded. What weight should be given evidence is a matter for the [factfinder] to decide." Haskins v. Commonwealth, 44 Va. App. 1, 9, 602 S.E.2d 402, 406 (2004) (quoting Miles v. Commonwealth, 205 Va. 462, 467, 138 S.E.2d 22, 27 (1964). "By finding [a] defendant guilty, therefore, the factfinder 'has found by a process of elimination that the evidence does not contain a reasonable theory of innocence.'" Id. (citing United States v. Kemble, 197 F.2d 316, 320 (3d Cir. 1952)). Additionally, "the jury's verdict cannot be overturned on appeal unless no rational trier of fact could have come to the conclusion it did." Stevens v. Commonwealth, 46 Va. App. 234, 248, 616 S.E.2d 754, 761 (2005). "The issue is whether a reasonable jury, upon consideration of all the evidence, could have rejected [appellant's] theories in his defense and [find] him guilty of murder beyond a reasonable doubt." Hudson, 265 Va. at 513, 578 S.E.2d at 785.

Appellant contends that Namiranian could have voluntarily disappeared and that she simply decided to abandon her current life and start anew elsewhere, or alternatively, that "the Commonwealth's evidence could only truly prove that [Namiranian] was *probably* dead." Appellant argues that Namiranian's journal entries revealed her to be a "sad, lonely woman [who] was unhappy at work" and who "dreamed about being in a different place." Appellant relies on these characterizations to assert the hypothesis that "Namiranian elected to live life in absentia," and argues that the Commonwealth never excluded that possibility.

However, the items that Namiranian would still have needed in a new life were all recovered from her house, except for her cell phones, which were found in pieces alongside Interstate 95. Namiranian's hairbrush and toothbrush, pets, car keys, and car were all at her house. Her passport, birth certificate, and citizenship documents were safely stored away. Namiranian had purchased tickets for an upcoming event in Washington, D.C., and there was no activity in any of her social media accounts or bank accounts after April 4. Because appellant's and Namiranian's cell phones moved together on April 5, both pinging off of towers located away from Namiranian's house, it can be inferred that appellant took Namiranian's phones with him after he left and attempted to dispose of them.

In positing his hypothesis of innocence, appellant undervalues the significant volume of the Commonwealth's evidence and overemphasizes the absence of Namiranian's body. The absence of the body is the only fact to which appellant's hypothesis is anchored, and that fact alone cannot prevent the tide of significant circumstantial evidence from sweeping his hypothesis away. Contrary to appellant's theory, "[t]he unlikelihood of [a victim's] voluntary disappearance is circumstantial evidence entitled to weight equal to that of [other] evidence." Epperly, 224 Va. at 229, 294 S.E.2d at 890. Courts have rejected efforts to "place a premium on stealthy murder and successful concealment of the victim's body." Id. Thus, Virginia jurisprudence already

- 14 -

contains examples of how a factfinder could interpret the absence of a body as probative evidence in a murder prosecution, and the principle does not support appellant's hypothesis.

Furthermore, appellant specifically argued the "Namiranian is living life in absentia" theory to the jury during his closing arguments and the jury rendered a guilty verdict, thus necessarily rejecting appellant's hypothesis. We recognize that "a factfinder cannot 'arbitrarily' choose, as between two equally plausible interpretations, one that incriminates [appellant]." Haskins, 44 Va. App. at 9, 602 S.E.2d at 406 (citing Dixon v. Commonwealth, 162 Va. 798, 803, 173 S.E. 521, 523 (1934)). If, "after the factfinder 'resolves all conflicts in the evidence' . . . the evidence of guilt or innocence remains anywhere near equipoise – that is, the facts are 'equally susceptible to two or more constructions' – then reasonable doubt exists as a matter of law." Id. (quoting Feigley v. Commonwealth, 16 Va. App. 717, 724, 432 S.E.2d 520, 525 (1993)). However, when a factfinder rejects a hypothesis of innocence as unreasonable, the "verdict cannot be overturned on appeal *unless no rational trier of fact* could have come to the conclusion it did." Stevens, 46 Va. App. at 248, 616 S.E.2d at 761 (emphasis added). Put another way, "[t]he issue is whether a reasonable jury, upon consideration of all the evidence, *could have* rejected [appellant's] theories in his defense and found him guilty of murder beyond a reasonable doubt." Hudson, 265 Va. at 513, 578 S.E.2d at 785 (emphasis added).

Here, all the evidence presented at trial could, and did, lead a rational trier of fact to determine that appellant had the motive and opportunity to murder Namiranian and that he succeeded in killing her. In reaching that conclusion, the jury rejected appellant's theory that Namiranian began living a life "in absentia," and the evidence supports as much. The Commonwealth is not required to address and disprove every conceivable possibility of what could have occurred. Rather, it is only required to eliminate all *reasonable* hypotheses of

innocence. The Commonwealth accomplished that here. Thus, we decline to disturb the jury's verdict.

Based on the evidence presented we cannot say the trial court was plainly wrong or without evidence to support it when it convicted appellant of second-degree murder. Accordingly, the judgment of the trial court is affirmed.

<u>Affirmed.</u>