COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Ortiz, Chaney and Senior Judge Haley
Argued by videoconference


NICHOLAS LAMONT TURNER

                                             MEMORANDUM OPINION[*] BY
v.      Record No. 0615-22-2                JUDGE DANIEL E. ORTIZ
                                                   JULY 18, 2023

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF LANCASTER COUNTY
R. Michael McKenney, Judge

Diane M. Lank (Diane M. Lank, PLC, on brief), for appellant.

Matthew P. Dullaghan, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Following a bench trial, Nicholas Lamont Turner appeals his convictions of two counts of

felony eluding and felony destruction of property. He argues that the trial court abused its

discretion in admitting preliminary hearing testimony from a witness that did not appear at trial,

erred in finding that he failed to establish an affirmative defense of duress, and erred in finding

the evidence sufficient to support the two eluding convictions. For the following reasons, we

disagree and affirm the convictions.

BACKGROUND

On September 15, 2020, around 11:00 p.m., Lancaster County Sheriff's Deputy T.O. Turner

("Deputy Turner")[1] was on patrol when dispatch told him to lookout for a silver sedan. A vehicle

matching the description raced by him going 79 miles per hour in a posted 55 mile-per-hour zone.

---

[*] This opinion is not designated for publication. See Code § 17.1-413(A).

[1] No relation to Nicholas Turner.

Deputy Turner activated his emergency equipment and maneuvered his vehicle to pursue the car. The silver sedan, driven by Nicholas Turner, continued along Route 200 and accelerated to speeds of 89 miles per hour. After several minutes, Deputy Turner lost sight of the vehicle and requested backup. When he could not locate the vehicle, Deputy Turner disengaged his pursuit and returned to the Sheriff's Office.

Meanwhile, Kilmarnock police officers and Virginia State Trooper Shane Hammell responded to the backup request and located the silver sedan traveling southbound on Route 200. Trooper Hammell activated his emergency lights and sirens, but Turner did not stop. Trooper Hammell pursued Turner through dark winding roads while appellant traveled up to 95 miles per hour.

Deputy Turner learned that the suspect vehicle was near Carlton Road and changed course to that location. Upon arriving, he saw the same silver sedan fleeing Trooper Hammell. He resumed pursuit behind Trooper Hammell, about 15 to 20 minutes after first losing sight of the sedan. Meanwhile, Nicholas Turner sped into Northumberland County at more than 80 miles per hour, crossed the double-yellow center line, and drove into oncoming traffic, causing another deputy—who was driving towards the appellant's vehicle—to swerve into a ditch to avoid a head-on collision.

Trooper Hammell then followed Turner into a residential area, where Turner swerved around a residence and over a rock feature in the front yard. Trooper Hammell drove over the same feature and damaged his vehicle, causing him to collide with the rear of the sedan. The sedan spun out into the yard, while Trooper Hammell's vehicle stopped in the roadway.

Turner, wearing a blaze orange stocking cap and dreadlocks, ran towards the marshland behind the residence. Meanwhile, the front seat passenger, a male with "puffy hair" later identified as Miles Sanders, remained in the vehicle. Trooper Hammell initially pursued Turner but stopped

for safety reasons. When he returned to the crash, he observed Sanders running across the front porch of a residence. However, Trooper Hammell remained with the sedan until backup arrived, as a female passenger—later identified as Kristen Parker—remained by the vehicle. Sanders was apprehended after backup arrived. He possessed marijuana, a loaded semiautomatic firearm, and ammunition.

Before trial, the Commonwealth moved to declare witness Miles Sanders unavailable and admit his preliminary hearing testimony. The Commonwealth introduced, without objection, a return-to-court slip signed by Sanders indicating that he would testify at trial. The Commonwealth then called Sanders' attorney, Grant Spears, to testify. Spears testified that he and Sanders had discussed planning for Sanders to appear at trial. Sanders informed Spears the evening before trial that he "had not yet found a method to travel here and would update" Spears. The next morning, before the trial started, Sanders told Spears that he "had been unable to arrange for transportation from Baltimore" and "was still waiting for the results of a COVID test." Spears admitted that he never asked the Commonwealth for assistance securing transportation and the Commonwealth did not offer any aid. Turner objected to using Sanders' preliminary hearing testimony. The trial court found that the Commonwealth undertook the necessary precautions to secure Sanders' appearance. It found Sanders unavailable as a witness and admitted the preliminary hearing transcript.

Spears took the stand and read the transcript of Sanders' prior testimony. Sanders testified that Turner was driving on September 15 when they passed an officer who activated his lights and sirens. Turner extinguished his headlights and kept driving. Five minutes later, Sanders saw more police lights in front of and behind the vehicle. Turner, however, did not stop. Sanders asked Turner to let him out of the vehicle, but Turner refused. Sanders admitted that there was a woman in the vehicle, but he did not know her name. Sanders noted that the woman also asked Turner to stop, but Turner remained silent. Sanders explained that when the vehicle crashed, he exited and

hid in some nearby bushes.  On cross-examination, Sanders admitted that he had a gun on his person, ammunition in his sock, and marijuana in his pocket.  Sanders, however, denied pointing the gun at Turner and demanding that Turner keep driving.

When the police arrested Turner on October 6, he admitted that he was driving the vehicle on September 15.  The chase lasted 90 minutes through Lancaster County, Northumberland County, Richmond County, and ended when the vehicle crashed back in Lancaster County.  The parties stipulated that the cost of the damage to Trooper Hammell's patrol vehicle was eight to nine thousand dollars.  Turner moved to strike the charges, but the trial court denied his motion.

Parker testified that while Turner and Sanders were driving her home, they informed her that they were going to purchase marijuana before dropping her off.  Parker noted that although Turner was her cousin's boyfriend, she did not know his nor Sanders' name.  As the trio drove, she noticed police lights.  Turner asked Parker if she could drive because his license was suspended, but she declined.  Sanders then drew two guns, pointed one at Turner, and told him to continue driving or he would hurt everyone in the vehicle.  Turner continued driving while at gunpoint.  When the vehicle crashed, Parker exited, ran a few feet, and laid in the field.  When officers found her, she told them about Sanders' threats.  On cross-examination, Parker admitted that she had been involved in a similar police chase that also ended in a crash.  Parker admitted that while incarcerated for an unrelated offense, she called Turner.  During that conversation, played for the court, Turner said that he "hoped that [Parker] come to court on his behalf."

Testifying in his own defense, Turner stated that his girlfriend told him to take her vehicle and drive her cousin, Parker, home.  Turner and Sanders picked Parker up and then went to meet his marijuana supplier in Kilmarnock.  Before arriving, Turner saw the police lights and turned onto a street, intending to stop.  He asked Parker to drive because his license was suspended but Sanders pulled two guns from his vest and told him not to stop.  Sanders said, "[t]his one's dirty," which

Turner understood to mean that Sanders had used the weapon to commit a crime. When Turner stopped at a stop sign, Sanders said, "I ain't playing, keep going, I ain't going down for this" and threatened to shoot Parker.

Turner testified that when the vehicle malfunctioned, Sanders ordered him to go to a location where Sanders could run and dispose of the guns and threatened to shoot the police if Turner refused. Turner claimed that he "entered a PTSD psychotic episode." He testified that he had difficulty controlling the vehicle and that he accidentally turned the lights off and swerved into oncoming traffic. When he crashed, he believed that Sanders was going to shoot the police, so he ran. He bolted behind a residence, fell in water, and collapsed on the other side of the creek. Scared that Sanders and the police were engaged in a shootout, Turner stayed there until daybreak. On cross-examination, Turner admitted that he had eight felony convictions. He also acknowledged that he was driving and that Sanders did not give him turn-by-turn directions.

The Commonwealth recalled Trooper Hammell and Deputy Turner. Trooper Hammell testified that he was involved in another car chase through Lancaster with Parker as a passenger. After that vehicle crashed, Trooper Hammell helped Parker out of the wreckage and she explained that she told the driver to stop. At Nicholas Turner's crash, Deputy Turner testified that Parker told him both the driver and the passenger possessed guns and "[i]f she told the police anything that they would kill her."

The trial court found that both Sanders and Parker were not credible, but that Deputy Turner was credible. It determined that Parker knew Nicholas Turner, despite her claims to the contrary. Turner admitted that he was driving on a suspended license and that he did not stop the vehicle immediately. Additionally, while skeptical that Turner was ever at gunpoint, the trial court accepted "for just a moment" that Sanders threatened him with a gun but found that Turner could have ended the chase safely. It noted that Turner was surrounded by four police officers and stated: "[h]ad

- 5 -

Mr. Turner stopped then and exited the vehicle, he would have had the benefit of at least four law enforcement officers in place to protect him and the passenger from any threat that Mr. Sanders may have presented to him." Finally, it found that Turner was not under duress.

As a result, the trial court found that Turner eluded both Trooper Hammell and Deputy Turner and that, because of his driving, Turner caused damage to Trooper Hammell's patrol vehicle. The trial court found Turner guilty of two felony offenses of eluding and felony destruction of property. Turner appeals.

## ANALYSIS

"On appeal, we review the evidence in the 'light most favorable' to the Commonwealth." *Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)). That principle requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom." *Kelly v. Commonwealth*, 41 Va. App. 250, 254 (2003) (en banc) (quoting *Watkins v. Commonwealth*, 26 Va. App. 335, 348 (1998)).

I. The trial court did not err in admitting Sanders' preliminary hearing testimony.

This Court reviews a trial court's decision to admit evidence under an abuse of discretion standard. *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019). Turner argues that the trial court erred in admitting Sanders' preliminary hearing testimony. He contends that the Commonwealth failed to establish Sanders' unavailability, as it did not exercise due diligence in attempting to secure Sanders' presence at trial. He further claims that Sanders' absence deprived him of "the opportunity to inquire fully of Mr. Sanders about the circumstances and his admission that he had a weapon in the vehicle." This deprivation, he argues, prevented him from fully presenting his defense of duress.

Our Supreme Court has held that:

> [T]he preliminary hearing testimony of a witness who is absent at a subsequent criminal trial may be admitted into evidence if the following conditions are satisfied: (1) that the witness is presently unavailable; (2) that the prior testimony of the witness was given under oath (or in a form of affirmation that is legally sufficient); (3) that the prior testimony was accurately recorded or that the person who seeks to relate the testimony of the unavailable witness can state the subject matter of the unavailable witness's testimony with clarity and in detail; and (4) that the party against whom the prior testimony is offered was present, and represented by counsel, at the preliminary hearing and was afforded the opportunity of cross-examination when the witness testified at the preliminary hearing.

*Longshore v. Commonwealth*, 260 Va. 3, 3-4 (2000); *see also* Va. R. Evid. 2:804(b). Certain hearsay statements, including former testimony, can be admitted at trial if "the declarant is dead or otherwise unavailable as a witness." Va. R. Evid. 2:804(a). "Where unavailability is premised upon a witness' absence from trial, the party offering the prior testimony must demonstrate the exercise of due diligence and reasonable efforts to obtain the presence of the witness." *Morgan v. Commonwealth*, 50 Va. App. 369, 375 (2007). The trial court must determine, in its discretion, whether the party seeking to introduce the evidence has shown that it exercised due diligence to secure the witness's attendance. *Cooper v. Commonwealth*, 26 Va. App. 537, 542-43 (1998). Even if "the efforts of the [party offering the statement] do not measure up to a high degree of diligence, . . . it is well settled that the sufficiency of the proof to establish the unavailability of a witness is largely within the discretion of the trial court." *Burton v. Oldfield*, 195 Va. 544, 550 (1954).

"Due diligence is that amount of prudence 'as is properly to be expected from, and ordinarily exercised by, a reasonable and prudent man under the particular circumstances.'" *McDonnough v. Commonwealth*, 25 Va. App. 120, 128 (1997) (quoting *Due Diligence*, *Black's Law Dictionary* (6th ed. 1990)). "Due diligence requires only a good faith, reasonable effort; it

does not require that every possibility, no matter how remote, be exhausted." *Cooper*, 26 Va. App. at 542 (quoting *McDonnough*, 25 Va. App. at 129). "We hold, however, that due diligence requires, at a minimum, that a party attempt to subpoena the witness or provide a reasonable explanation why a subpoena was not issued." *McDonnough*, 25 Va. App. at 129.

Here, the record established that Sanders signed a return-to-court slip after his preliminary hearing testimony. The Commonwealth coordinated with Sanders' attorney, Spears, to secure his presence at trial. The Commonwealth only learned on the morning of the trial that Sanders would not attend. The record demonstrates that the Commonwealth met the basic requirement of serving Sanders while he was still in court and that it made reasonable efforts to secure Sanders' presence. *See id.* Because Sanders' preliminary hearing testimony was under oath, properly recorded, and subject to cross-examination, the trial court did not err in admitting Sanders' testimony.

## II. The evidence was sufficient to support Turner's convictions.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by

the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

   A. The trial court was not plainly wrong in rejecting Turner's affirmative defense of duress.

  Turner argues that the evidence supports a finding that he was in reasonable fear of imminent death or serious bodily injury during the police chase. Turner contends that "uncontroverted testimony" by himself and Parker showed that Sanders threatened them with two guns. Turner further argues that the trial court mistakenly found that, even if Turner was subject to duress, he had an opportunity to escape and seek protection when police officers were present.

  "The sole responsibility to determine the credibility of witnesses, the weight to be given to their testimony, and the inferences to be drawn from proven facts lies with the fact finder." *Blankenship v. Commonwealth*, 71 Va. App. 608, 619 (2020) (quoting *Ragland v. Commonwealth*, 67 Va. App. 519, 529-30 (2017)). The fact finder's conclusions "on issues of witness credibility may be disturbed on appeal only when . . . the witness' testimony was 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Ashby v. Commonwealth*, 33 Va. App. 540, 548 (2000) (quoting *Fisher v. Commonwealth*, 228 Va. 296, 299 (1984)). "In all other cases, we must defer to the conclusions of 'the fact finder[,] who has the opportunity of seeing and hearing the witnesses.'" *Id.* (quoting *Schneider v. Commonwealth*, 230 Va. 379, 382 (1985)).

  "The 'reasonable hypothesis of innocence' concept is also well defined. The Commonwealth need exclude only reasonable hypotheses of innocence that 'flow from the evidence itself, and not from the imagination' of the defendant." *Kelley v. Commonwealth*, 69 Va. App. 617, 629 (2019) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). Simply "because [a] defendant's theory of the case differs . . . does not mean that every reasonable

hypothesis consistent with his innocence has not been excluded." *Ray v. Commonwealth*, 74 Va. App. 291, 308 (2022) (first alteration in original) (quoting *Edwards v. Commonwealth*, 68 Va. App. 284, 301 (2017)).  The fact finder must decide what weight the evidence should be given.  *Id.*  "While a factfinder may not arbitrarily disregard a reasonable doubt, whether 'the hypothesis of innocence is reasonable is itself a "question of fact," subject to deferential appellate review.'"  *Burton v. Commonwealth*, 58 Va. App. 274, 285-86 (2011) (quoting *Clanton*, 53 Va. App. at 572).  "By finding [a] defendant guilty, therefore, the factfinder 'has found by a process of elimination that the evidence does not contain a reasonable theory of innocence.'"  *Ray*, 74 Va. App. at 308 (alteration in original) (quoting *Edwards*, 68 Va. App. at 301).

"Duress excuses criminal behavior 'where the defendant shows that the acts were the product of threats inducing a reasonable fear of immediate death or serious bodily injury.'" *Arnold v. Commonwealth*, 37 Va. App. 781, 787 (2002) (quoting *Graham v. Commonwealth*, 31 Va. App. 662, 674 (2000)).  A defendant asserting the defense of duress, "must show that the threat . . . was coupled with evidence that he 'reasonably believed that participation in the crime was the *only* way to avoid the threatened harm.'"  *Graham*, 31 Va. App. at 675 (quoting Roger D. Groot, *Criminal Offenses and Defenses* 181 (4th ed. 1999)).  "Vague threats of future harm, however alarming, will not suffice to excuse criminal conduct."  *Pancoast v. Commonwealth*, 2 Va. App. 28, 33 (1986).  And a defendant may not rely on duress as a defense if he failed to take advantage of a reasonable opportunity to avoid doing the criminal acts without being harmed. *Graham*, 31 Va. App. at 675.

Here, the trial court considered and rejected Turner's affirmative defense of duress.  The trial court did not find credible Turner's or Parker's testimony that Sanders held Turner at gunpoint.  The trial court noted that even if Turner was held at gunpoint, he could have stopped

his vehicle when he was surrounded by four patrol vehicles.  Because Turner continued to evade the officers and did not take advantage of the opportunity to escape, the trial court found that Turner failed to prove duress.

In finding that Turner had an opportunity to escape, the trial court simply provided an alternative reason for rejecting Turner's defense of duress.  Even if we find this alternative reason unpersuasive, we cannot disturb the trial court's explicit finding that Turner and Parker's testimony was not "particularly credible."  The trial court's rejection of this testimony was not arbitrary.  At the preliminary hearing, Sanders testified that he did not threaten Turner and Parker.  More importantly, the trial court relied on Deputy Turner, who testified that Parker had told him immediately after the chase that if "she told the police anything[,] *they* would kill her." (Emphasis added).  Finally, the trial court noted that Turner claimed that Sanders had two guns, while the police only found one.  Because sufficient evidence supported the trial court's finding that Turner did not act under duress, we will not disturb this decision on appeal.

B.  The evidence was sufficient to support a finding of two separate eluding acts.

Turner argues that the evidence established, at most, one continuing offense instead of two separate acts of eluding.  He contends that the charges differ only in the dates of the offense and argues that the difference is meaningless, as the chase began late in the evening on September 15, 2020, and ended in the early morning hours of September 16, 2020.  Additionally, Turner emphasizes that the trial court continuously referred to the offense of eluding, using the singular offense rather than plural offenses.  Finally, Turner argues that he did not "endanger[] the operation of the law enforcement vehicle or endanger[] a person during the first part of the chase."

> Any person who, having received a visible or audible signal from any law-enforcement officer to bring his motor vehicle to a stop, drives such motor vehicle in a willful and wanton disregard of such signal so as to interfere with or endanger the operation of

- 11 -

the law-enforcement vehicle or endanger a person is guilty of a Class 6 felony.

Code § 46.2-817(B).

"No person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. "Subjecting an accused to multiple punishments for the same offense violates both state and federal constitutional protections against double jeopardy." *Roach v. Commonwealth*, 51 Va. App. 741, 748 (2008). However, "[t]he Double Jeopardy Clause is not abridged if an accused is subjected to punishment for two offenses that are supported by separate and distinct acts." *Id.* Thus, the trial court did not violate the Double Jeopardy Clause if Turner's acts constituted two eluding offenses rather than one continuing offense.

"A continuing offense is a continuous, unlawful act or series of acts set on foot by a single impulse and operated by an unintermittent force, however long a time it may occupy." *Hodnett v. Commonwealth*, 56 Va. App. 234, 237 (2010) (quoting *Thomas v. Commonwealth*, 38 Va. App. 319, 324 (2002)). "In determining whether the conduct underlying the convictions is based upon the 'same act,' the particular criminal transaction must be examined to determine whether the acts are the same in terms of time, situs, victim, and the nature of the act itself." *Hall v. Commonwealth*, 14 Va. App. 892, 898 (1992); *see Carter v. Commonwealth*, 16 Va. App. 118, 129 (1993) (focusing on "factors such as the: nature of the act or acts; time; place; intent; possibility of cumulative punishment; and, number of victims," but cautioning that the list "is not exhaustive and the [fact finder] may properly consider the victim's subjective understanding of the circumstances, along with all the other evidence presented" when determining "whether the conduct constituted a single offense or multiple offenses").

Here, after observing the silver sedan exceed the speed limit, Deputy Turner activated his lights and attempted to conduct a traffic stop. Turner did not stop and, instead, extinguished his

headlights to avoid detection. Deputy Turner, being unable to find the vehicle on the dark roads, disengaged his pursuit. At that time, the first eluding was complete. When Turner believed the officers were gone, he reactivated his headlights. Minutes later, Trooper Hammell observed Turner's car and activated his lights and sirens. Turner again disregarded the signals to stop and fled from the police for over an hour. At that time, the second eluding was complete. Although Turner drove continuously between the two chases, his failure to stop for Trooper Hammell was not a continuation of his failure to stop for Deputy Turner. Instead, the second act involved a new formation and execution of purpose. Thus, the evidence supports the trial court's finding that Turner committed two separate and distinct acts of eluding.

In a felony eluding offense, "the object of the endangerment can be the driver himself, the police officer, or anyone else on the road that could be put at risk from the driver's eluding." *Coleman v. Commonwealth*, 52 Va. App. 19, 24 (2008). "That the exposure to danger does not result in any actual harm is a welcome fortuity, but not a legal defense." *Id.* Here, a rational fact finder could find beyond a reasonable doubt that Turner's driving after the officers' commands to stop endangered Turner, his passengers, and any others on the road that night. Turner disregarded Deputy Turner's signal and extinguished his lights at night on dark winding roads. When he believed the deputy had disengaged, he reactivated his headlights. When Trooper Hammell attempted to stop Turner, he again disregarded the officer's signal and continued to drive for an hour. His erratic speed ranged from 79 to 95 miles per hour through winding back roads and residential neighborhoods late at night. At one point in the chase, Turner almost collided with a sheriff's deputy traveling in the opposite direction. After attempting to drive around a home, Turner's driving damaged Trooper Hammell's patrol vehicle, causing it to collide with Turner's car.

The totality of the evidence amply supports the trial court's conclusion that Turner's hour-long chase endangered himself, his passengers, the police officers, and anyone else on the road. The trial court was not plainly wrong in finding Turner guilty of two counts of felony eluding.

## CONCLUSION

We find that the trial court did not abuse its discretion in admitting Sanders' preliminary hearing testimony and that the evidence was sufficient to support Turner's two felony eluding convictions. Accordingly, we affirm the trial court's judgment.

*Affirmed.*