UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Judges Ortiz, Chaney and Senior Judge Haley
Argued by videoconference

CALVIN ELTON CLARK

v.      Record No. 0880-22-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE JAMES W. HALEY, JR.
AUGUST 1, 2023

FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Steven C. McCallum, Judge

Gregory R. Sheldon (BainSheldon, PLC, on brief), for appellant.

David A. Stock, Assistant Attorney General (Jason S. Miyares,
Attorney General; Leah A. Darron, Senior Assistant Attorney
General, on brief), for appellee.

Calvin E. Clark appeals his conviction, following a jury trial, for second-degree murder, in

violation of Code § 18.2-32.[1] Clark asserts that his Sixth Amendment right to confront witnesses

was violated when a witness testified while wearing a mask and that the evidence is insufficient to

sustain his conviction. For the following reasons, we disagree and affirm Clark's conviction.

BACKGROUND

On appeal, "we review the evidence in the 'light most favorable' to the Commonwealth."

*Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc) (quoting *Commonwealth v.*

*Hudson*, 265 Va. 505, 514 (2003)). That principle requires us to "discard the evidence of the

accused in conflict with that of the Commonwealth, and regard as true all the credible evidence

favorable to the Commonwealth and all fair inferences that may be drawn therefrom." *Kelly v.*

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Clark was also charged with, but acquitted of, abduction with the intent to defile.

*Commonwealth*, 41 Va. App. 250, 254 (2003) (en banc) (quoting *Watkins v. Commonwealth*, 26 Va. App. 335, 348 (1998)).

In April 2020, Walter Newcomb visited his sister, Pamela Newcomb, in Richmond. In the morning of April 19, 2020, Lewis Clack, Pamela's neighbor, and Clark were at the residence socializing. Lewis testified that he had only met Clark once before, but Clark approached him and inquired about splitting the cost of drugs. Lewis agreed, and the pair drove in a gold car with a black back fender to purchase crack cocaine.

After Lewis and Clark procured cocaine, they encountered a woman they knew as "Truck."[2] They asked Truck if she needed a ride home; she accepted. When the trio arrived at Truck's residence, they began smoking cocaine. Clark left and returned to Truck's residence with Pamela.

The group decided to continue their activities in a hotel room. Before leaving, Lewis overheard Clark and Pamela arguing about forty dollars. The group traveled in the gold vehicle, stopping at a Food Lion along the way. In surveillance stills from the Food Lion video, Lewis identified himself as the man in the white shirt and Clark as the man in the red shirt. Lewis explained that he bought cigarettes and withdrew $150 in cash. This transaction occurred between 6:08 p.m. and 6:11 p.m.

The group then drove to the Delux Motel, a short distance from the Food Lion. Security camera footage from a nearby store confirmed that the gold vehicle with a black back fender arrived at 6:14 p.m. A receipt from Lewis's transaction with the motel confirms that Lewis paid for a room at 6:19 p.m. Lewis, Clark, and Truck then entered the rented room. Meanwhile, Pamela went to the room next door because she knew several of the occupants. Lewis and Clark followed Pamela and found her explaining to the room's occupants that Clark owed her money. Lewis stated he did not know the room's occupants and that he and Clark left and returned to his rented room.

---

[2] Law enforcement never learned Truck's legal name.

When Pamela rejoined Lewis, Clark, and Truck, she remained upset with Clark and continued to demand that Clark pay her forty dollars. Lewis attempted to pacify Pamela by offering to pay her the money Clark owed, but Pamela refused. Eventually, Pamela requested to go home and left with Clark. On surveillance video, at 6:57 p.m., a gold vehicle with a black back fender can be seen leaving the Delux Motel.

Around 7:15 p.m. that evening, Rusty Nuckols was walking his dog in the Holiday Bowl parking lot when he saw a bluish-silver car with mismatched front and back fenders come from behind the building. The vehicle caught his attention because it sped over a large pothole and up the road. He described the driver as a "sweating" "black male . . . wearing a ball cap." Nuckols acknowledged that he observed the vehicle for only twenty seconds and that he was colorblind. He explained that he has difficulty distinguishing between colors of a similar hue but that he could differentiate between light and dark colors.

Nuckols continued to walk his dog in the direction the vehicle had come, and when he arrived behind the building several minutes later, he discovered a woman lying face down in the grass. Nuckols called to her, but she did not respond. Nuckols immediately called 911 at 7:36 p.m.

Before Nuckols testified, Clark's trial counsel asserted, "I think the jurors need to be able to see Mr. Nuckols'[s] face so that they can judge his credibility, which is part of your facial expressions." Trial counsel then "respectfully ask[ed], since [Nuckols was] socially distanced, that he remove his mask." The trial court left the decision of whether to remove the mask to Nuckols, who chose to keep his mask on.[3]

Also at 7:36 p.m., the gold vehicle with the black back fender returned to the Delux Motel. When Clark returned, Lewis noticed that Clark was sweating and "had some scratch marks on his

---

[3] The record is unclear how Nuckols's mask covered his face. At oral argument, Clark's appellate counsel conceded that the mask was likely covering the bridge of Nuckols's nose to his mouth as was customary during the COVID-19 pandemic.

arm" that were bleeding. When asked about the scratches, Clark stated that Pamela had "tried to fight him in front of all the people that [were] standing outside" her home.

Meanwhile, Chesterfield County Police Officers Rizzo and Balducci arrived at the Holiday Bowl at 7:41 p.m. and found Pamela face down in a multicolored dress, the bottom third of which was wet. Pajama pants were at her ankles, and several of her blue acrylic nails were missing. She had scrapes and blood on her fingers, hands, and knees, a horizonal ligature mark around her neck, and blood around her nose and mouth. After talking with Nuckols, Detective Waggoner determined that they were looking for a "very unique vehicle."

Medical Examiner Dr. Crystal VanDusen testified that Pamela had traces of methamphetamine, cocaine, and their metabolites in her system. A petechial hemorrhage was found in her right lower eyelid. Dr. VanDusen explained that petechial hemorrhages occur when there's increased intravascular pressure in the area the hemorrhage forms. Dr. VanDusen noted that there was blood in Pamela's nose and that she had "a horizontal red mark across [her] neck" as well as red abrasions and contusions on different parts of her neck. There were "fractures in the hyoid bone and thyroid cartilage, and hemorrhage of the neck muscles, including the sternum, the mastoid muscle." Dr. VanDusen determined that "[t]his trauma is consistent with strangulation."

After Clark left the motel, Lewis went to the room next door and asked the occupants if they had heard from Pamela; they had not. When walking back to his room, Lewis noticed that the gold vehicle was parked outside and had a crack on the passenger side windshield, which was not there earlier. Suspicious that something happened to Pamela, Lewis and Truck left the motel in the gold vehicle.[4]

---

[4] Lewis explained that the vehicle's keys were attached to the steering wheel, so they never left the vehicle.

When he entered the vehicle, Lewis smelled urine, and Truck had to put clothes on the front passenger seat to avoid sitting directly on the wet surface. After taking Truck home, Lewis parked the gold vehicle across from the King's Supermarket. Lewis stated he never moved the car again.

After parking the gold vehicle around 8:30 p.m., Lewis saw Walter, Pamela's brother. Lewis asked Walter if Pamela arrived home; Walter responded that she had not. The next morning when Pamela had not returned home, Walter went to Lewis's home and asked about Pamela's whereabouts. Lewis stated he did not know Pamela's whereabouts but noted that he last saw her in the gold vehicle, which was parked at King's Supermarket. Walter and Lewis walked to King's Supermarket and found the gold vehicle as Lewis had left it. Walter observed that his sister's headband and one house shoe were in the backseat. Concerned for his sister, Walter called the police to report Pamela missing.

Richmond Police Officer Powell responded to Walter's 911 call. Body worn camera footage of Officer Powell's interaction with Walter and Lewis was shown to the jury. In it, Walter and Lewis indicated that the gold vehicle with the black back fender, behind which Officer Powell had parked, was where Pamela was last seen. When officers returned to investigate the vehicle in connection with Pamela's homicide, it was gone.

In the evening of April 20, Richmond Police Officer Morely conducted a traffic stop of a gold vehicle with a mismatched back fender and driver fitting the description Nuckols gave Detective Waggoner. When Officer Morely attempted a second traffic stop several hours later, the driver fled. In a recorded interview with the police, played for the jury, Clark identified himself in the photographs obtained from Officer Morely's body worn camera.

On April 21, the police located the vehicle and searched it the next day. The vehicle was a gold four-door Chevrolet Malibu with a black back fender, primer paint on the passenger door, thirty-day temporary tags for a 2008 Honda Accord, and a cracked windshield. Upon opening the

vehicle, investigators noticed a strong aroma of urine. Pamela's fingerprints were recovered from inside the vehicle, and a partial print from the front passenger door handle was linked to Clark. Investigators found a blue acrylic nail on the front passenger floorboard, as well as a Food Lion receipt on the rear floorboard. Testing of the acrylic nail determined it had come from Pamela.

Testing of a stain on the car's gear shift proved that Pamela could not "be eliminated as a major contributor to [the] DNA mixture" and that Clark could not "be eliminated as a minor contributor to [the] DNA mixture profile." The "probability of randomly selecting an unrelated individual with a DNA profile matching the major [and minor] profile developed is one in greater than 7.2 billion." Testing determined that the fingernail clippings from Pamela had Pamela's DNA and the DNA of two unknown individuals. Upon further statistical analysis, Clark could not be eliminated as a contributor to the DNA mixture profile in the fingernail clippings.

On April 27, the police located Clark in a hotel room. A forensic investigator photographed five linear marks on Clark's arms. In the recorded interview with Detective Waggoner, Clark denied ownership of the gold vehicle but admitted he drove the vehicle on the evening of April 19. Clark acknowledged that on that day he was at a residence with others to smoke crack cocaine and engage in sexual activity. The group left the residence and stopped at a Food Lion before continuing to the motel. When shown images from the Food Lion surveillance cameras, Clark identified himself as the man in the red shirt and baseball hat.

Clark claimed that Pamela was upset with Lewis over forty dollars. Clark admitted that he and Pamela left the motel because she wished to go home. He claimed, however, that she got out of the car immediately after they left the motel. After Pamela exited the vehicle, he went to a gas station to meet a man named Red. Clark then traveled to a nearby home with a white Monte Carlo parked in front to use the homeowner's phone. While there, the homeowner, an older white man, helped him fix the battery on the gold vehicle. Thereafter he returned to the motel. Clark believed

he returned to the motel twenty minutes after leaving with Pamela. Officers were unable to verify any of the details of Clark's alibi. Detective Waggoner, however, determined that a vehicle could travel from the motel to the Holiday Bowl in ten minutes.

At the close of the Commonwealth's evidence, Clark moved to strike the abduction and murder charges. The trial court denied Clark's motion to strike. After resting, Clark renewed his motion to strike both charges, which the trial court denied. The jury convicted Clark of second-degree murder and acquitted him of abduction. Clark moved to set aside his second-degree murder verdict. The trial court denied his motion. Clark appeals.

## ANALYSIS

### I. Rule 5A:18

Clark asserts that his Sixth Amendment right to confront witnesses against him was violated when Nuckols testified with a mask. He contends that his right to face-to-face confrontation includes viewing the witness's entire face. Since the mask concealed the lower portion of Nuckols's face, Clark and the jury were unable to observe Nuckols's facial expressions, which Clark submits is a significant determination of credibility. Noting that only Nuckols's testimony linked him to the Holiday Bowl parking lot, Clark concludes that if the jury had found Nuckols was not credible, he likely would have been acquitted.

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. Accordingly, "this Court 'will not consider an argument on appeal [that] was not presented to the trial court.'" *Farnsworth v. Commonwealth*, 43 Va. App. 490, 500 (2004) (alteration in original) (quoting *Ohree v. Commonwealth*, 26 Va. App. 299, 308 (1998)). "Rule 5A:18 applies to bar even constitutional claims." *Id.* (quoting *Ohree*, 26 Va. App. at 308).

Furthermore, "[p]rocedural-default principles require that the argument asserted on appeal be the same as the contemporaneous argument at trial." *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019). "[N]either an appellant nor an appellate court should 'put a different twist on a question that is at odds with the question presented to the trial court.'" *Id.* at 744 (quoting *Commonwealth v. Shifflett*, 257 Va. 34, 44 (1999)). "Of critical importance in this case is the principle that '[n]ot just any objection will do.'" *Jones v. Commonwealth*, 71 Va. App. 597, 606 (2020) (alteration in original) (quoting *Bethea*, 297 Va. at 743). "A trial court must be alerted to the precise 'issue' to which a party objects." *Kelly v. Commonwealth*, 42 Va. App. 347, 354 (2004) (quoting *Neal v. Commonwealth*, 15 Va. App. 416, 422 (1992)). "Although the objecting party need not cite specific legal authority to the trial court in order to rely on it on appeal, he must present the objection itself with sufficient particularity to permit the judge, if he or she agrees, to take necessary action." *Jones*, 71 Va. App. at 607. For it is "[s]pecificity and timeliness [that] undergird the contemporaneous-objection rule [and] animate its highly practical purpose." *Bethea*, 297 Va. at 743.

Here, Clark raises his Sixth Amendment argument for the first time on appeal. At trial, Clark stated that "the jurors need to be able to see Mr. Nuckols'[s] face so that they can judge his *credibility*, which is part of your facial expressions." He then requested that the trial court direct Nuckols to remove his mask. When making his objection, Clark did not state that his right to *confront* Nuckols would be infringed if Nuckols remained masked. Thus, nothing in Clark's objection alerted the trial court that his Sixth Amendment right to confront witnesses was being infringed. Accordingly, the trial court had no opportunity to consider the issue presented on appeal. *See Neal*, 15 Va. App. at 422 ("This Court has said '[t]he primary function of Rule 5A:18 is to alert the trial judge to possible error so that the judge may consider the issue intelligently and take any corrective actions necessary to avoid unnecessary appeals, reversals

and mistrials.'" (alteration in original) (quoting *Martin v. Commonwealth*, 13 Va. App. 524, 530 (1992))).

"Although Rule 5A:18 contains exceptions for good cause or to meet the ends of justice, [Clark] does not argue these exceptions and we will not invoke them *sua sponte*." *Williams v. Commonwealth*, 57 Va. App. 341, 347 (2010). Accordingly, because Clark failed to preserve his Sixth Amendment Confrontation Clause argument, we do not address it.

## II. Sufficiency of the Evidence

Clark argues that the evidence was insufficient to prove he killed Pamela and failed to exclude every reasonable hypothesis of innocence that someone else killed Pamela. "When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

## A. Witness Credibility

Clark contends that because Nuckols's description of the vehicle, and its driver, were inconsistent and inaccurate, Nuckols was therefore unreliable. "The sole responsibility to

determine the credibility of witnesses, the weight to be given to their testimony, and the inferences to be drawn from proven facts lies with the fact finder." *Blankenship v. Commonwealth*, 71 Va. App. 608, 619 (2020) (quoting *Ragland v. Commonwealth*, 67 Va. App. 519, 529-30 (2017)). Moreover, "[t]he conclusions of the fact finder on issues of witness credibility may be disturbed on appeal only when we find that the witness' testimony was 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Ashby v. Commonwealth*, 33 Va. App. 540, 548 (2000) (quoting *Fisher v. Commonwealth*, 228 Va. 296, 299 (1984)). "In all other cases, we must defer to the conclusions of 'the fact finder[,] who has the opportunity of seeing and hearing the witnesses.'" *Id.* (alteration in original) (quoting *Schneider v. Commonwealth*, 230 Va. 379, 382 (1985)).

"A legal determination that a witness is inherently incredible is very different from the mere identification of inconsistencies in a witness' testimony or statements." *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019). "Testimony may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law." *Id.* "To be 'incredible,' testimony 'must be either so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006) (quoting *Cardwell v. Commonwealth*, 209 Va. 412, 414 (1968)).

On direct examination Nuckols admitted that he was colorblind. He explained that he had difficulty distinguishing similar colors from each other but that he can distinguish light colors from dark colors. Nuckols testified that he saw a blue car with a mismatched front and back fender come from behind the Holiday Bowl and drive through the parking lot at a high rate of speed. Although he only glimpsed the vehicle for twenty seconds, Nuckols observed that the driver was a sweaty black man wearing a baseball hat.

Any inconsistencies in Nuckols's testimony were put before the jury for its consideration. *See Kelley*, 69 Va. App. at 626 ("[A]s Virginia law dictates, '[p]otential inconsistencies in testimony are resolved by the fact finder,' not the appellate court." (second alteration in original) (quoting *Towler v. Commonwealth*, 59 Va. App. 284, 292 (2011))). In exercising its role as the fact finder, the jury weighed the evidence and resolved any inconsistencies in favor of the Commonwealth in this case.

Furthermore, the inconsistencies within Nuckols's testimony that Clark raises to this Court simply do not render his testimony "so manifestly false that reasonable men ought not to believe it[.]" *See Juniper*, 271 Va. at 415. Clark argues that Nuckols failed to identify a crack in the windshield, that primer paint was on one side of the vehicle, and that the vehicle had temporary tags. Additionally, Clark notes that (i) Nuckols incorrectly described the vehicle as bluish silver with a mismatched front fender when the vehicle and front fender were both gold and (ii) Nuckols was never required to identify the vehicle in a photograph before or at trial.

As noted *supra*, the jury was aware that Nuckols was colorblind and knew that Nuckols could only distinguish between dark and light colors. Although Nuckols was never asked to identify the vehicle he saw in a photograph before or at trial, the jury heard Nuckols's testimony and his 911 call and saw multiple pictures of the gold vehicle from different sources and in different lighting conditions. Whether Nuckols's inconsistences were detrimental to his credibility was a determination for the jury. By finding Clark guilty, the jury concluded that Nuckols was credible and that the vehicle he observed was the vehicle Clark had been driving on the night of the murder. Accordingly, we find that the record supports the jury's credibility determination.

## B. Circumstantial Evidence

Clark further argues that the Commonwealth's evidence was circumstantial and insufficient to identify him as the perpetrator. It is firmly established that "[c]ircumstantial evidence is competent and is entitled to as much weight as direct evidence provided that the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Kelley*, 69 Va. App. at 629 (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "Circumstantial evidence is not 'viewed in isolation' because the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable [fact finder]' to conclude beyond a reasonable doubt that a defendant is guilty." *Rams v. Commonwealth*, 70 Va. App. 12, 27 (2019) (alteration in original) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005)).

The evidence presented in this case was sufficient to convict Clark of second-degree murder. Clark admitted that he left the motel with Pamela in the gold vehicle. Lewis's testimony and surveillance video from a nearby store corroborate that a gold sedan with a black back fender left the motel around 7:00 p.m. on April 19.

Nuckols saw a light-colored sedan with mismatched fenders arrive from behind the Holiday Bowl and speed through the parking lot. Although he only glimpsed the vehicle for twenty seconds, Nuckols was able to give a general description of the driver. Within minutes, Nuckols discovered Pamela's body behind the building and called 911.

When Clark returned to the motel around the same time Nuckols was calling for emergency help, Lewis noticed that Clark was sweating and had bleeding scratches on his arms. Testing determined that Clark could not be eliminated as a contributor to the DNA mixture from Pamela's nails and that his DNA could not be eliminated as a minor contributor to the blood found on the gear shift. Pamela's DNA could not be eliminated as a major contributor to the

blood mixture on the gear shift. Detective Waggoner determined that a vehicle could travel from the Holiday Bowl to the motel in ten minutes. Based on the totality of the circumstances, a reasonable fact finder could conclude that Clark murdered Pamela.

### C.  Reasonable Hypothesis of Innocence

Finally, Clark argues that the Commonwealth failed to exclude every reasonable hypothesis of innocence that someone else killed Pamela. "The 'reasonable hypothesis of innocence' concept is also well defined. The Commonwealth need exclude only reasonable hypotheses of innocence that 'flow from the evidence itself, and not from the imagination' of the defendant." *Kelley*, 69 Va. App. at 629 (quoting *Pijor*, 294 Va. at 512). "It is firmly established that '[c]ircumstantial evidence is competent and is entitled to as much weight as direct evidence provided that the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt.'" *Id.* (alteration in original). "[M]erely because [a] defendant's theory of the case differs from that taken by the Commonwealth does not mean that every reasonable hypothesis consistent with his innocence has not been excluded. What weight should be given evidence is a matter for the [factfinder] to decide." *Edwards v. Commonwealth*, 68 Va. App. 284, 301 (2017) (second and third alterations in original) (quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 9 (2004)).

"By finding [a] defendant guilty, therefore, the factfinder 'has found by a process of elimination that the evidence does not contain a reasonable theory of innocence.'" *Id.* (alteration in original) (quoting *Haskins*, 44 Va. App. at 9). "While a factfinder may not arbitrarily disregard a reasonable doubt, whether 'the hypothesis of innocence is reasonable is itself a "question of fact," subject to deferential appellate review.'" *Burton v. Commonwealth*, 58 Va. App. 274, 285-86 (2011) (quoting *Clanton*, 53 Va. App. at 572).

Because the jury found Clark guilty, it is assumed the jury "found by a process of elimination that the evidence does not contain a reasonable theory of innocence." *Edwards*, 68 Va. App. at 301 (quoting *Haskins*, 44 Va. App. at 9). Considering the totality of the evidence, the jury did not err in rejecting Clark's hypothesis of innocence—that someone else killed Pamela. The Commonwealth's evidence was competent, was not inherently incredible, and was sufficient to prove beyond a reasonable doubt that Clark was guilty of second-degree murder.

CONCLUSION

We find that Clark's Sixth Amendment claim is procedurally defaulted and that the evidence was sufficient to convict Clark of second-degree murder. Accordingly, we affirm his conviction.

*Affirmed*.