COURT OF APPEALS OF VIRGINIA

Present:   Judges Huff, AtLee and Ortiz
Argued at Fairfax, Virginia

UNPUBLISHED

JONATHAN DANIEL MIHOKOVICH

MEMORANDUM OPINION[*] BY
v.      Record No. 1768-23-4           JUDGE DANIEL E. ORTIZ
DECEMBER 30, 2024

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF FREDERICK COUNTY
Alexander R. Iden, Judge

Jason E. Ransom (Law Office of Ransom & Silvester, on brief), for
appellant.

Lindsay M. Brooker, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Jonathan Daniel Mihokovich appeals his convictions, following a jury trial, for

second-degree murder and use of a firearm in commission of a murder, in violation of Code

§§ 18.2-32 and -53.1.  On appeal, Mihokovich argues that the evidence was insufficient to prove

that he killed Keith Tolson.  He also argues that the trial court abused its discretion when it refused

to admit a third-party statement and when it denied his motion to set aside the verdict.  For the

following reasons, we disagree and affirm the convictions.

BACKGROUND

We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing

party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting

*Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).  Doing so requires that we "discard the

evidence of the accused in conflict with that of the Commonwealth, and regard as true all the

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom."
*Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

I.  The Commonwealth's Evidence

On October 27, 2020, Deputy Robert Marcelle responded to a report of shots fired at a McDonald's in Frederick County.  Upon arriving, Deputy Marcelle observed a white male, later learned to be Keith Tolson, on the ground with multiple gunshot wounds to his face.  When paramedics arrived, they found no heartbeat and pronounced Tolson dead at the scene.

Investigators Todd Swartz and Brandon Hazelwood responded to the area to process the scene.  Near Tolson's body officers recovered two spent .44 caliber cartridge casings and his cell phone.  Officers learned that Tolson had been staying at the Econo Lodge behind the McDonald's and that he had visited the Liberty gas station across the street that morning.  Consequently, officers recovered surveillance camera footage from the Econo Lodge, the Liberty gas station, and from truck "dash cameras" that recorded the Liberty parking lot.

Tolson's phone records revealed that he had been texting Mihokovich about a drug transaction in the evening on October 26, 2020, and into the early morning on October 27, 2020.  Based on Tolson's text exchanges with others, it appeared that he planned to cheat Mihokovich in the transaction.

Initially, Mihokovich and Tolson met at the Liberty gas station at 10:41 p.m.  At 11:01 p.m., Tolson left Liberty and returned to the Econo Lodge.  Shortly thereafter, Mihokovich also left the gas station and traveled to the Econo Lodge.  Once at the Econo Lodge, Mihokovich texted Tolson his location and commented that the police were patrolling the area.  As time wore on, Mihokovich appeared to become increasingly exasperated with Tolson texting, "This ain't cool, me just chilling out here" and "Man, I hope you not playing games with me, bro.  I am too old for this shit."  Eventually, Tolson responded that he was at a 7-Eleven and the men agreed to

meet at Liberty later. Despite telling Mihokovich that he was at a 7-Eleven, Tolson's phone data placed him at the Econo Lodge.

At 11:41 p.m., Mihokovich texted Tolson again. When Mihokovich returned to the Econo Lodge he went to Roy Fincham's room, where Tolson was also located. Mihokovich remained in Fincham's room for several minutes before returning to the parking lot with Fincham. Footage from the Econo Lodge then showed Tolson also depart Fincham's room and flee into the woods behind the hotel shortly after Mihokovich and Fincham left.

In text messages to Tolson, Mihokovich warned that "[i]t's all going to go down tonight bro damn wow. Hate prison dawg. Begins bro. Pegon."[1] Mihokovich informed Tolson that "Your boy he lost every thing 4 u. U ever ride a bike with a brother. Nothing matters. We all going down bro." In response, Tolson taunted Mihokovich, told Mihokovich he was in Front Royal, and asserted that Mihokovich would never find him.

At 12:22 a.m. on October 27, 2020, Mihokovich texted Tolson, "I feel bad too cause these brothers of mine got kids. And family's. They going to get token away from." Tolson replied, "blah blah blah." Mihokovich responded, "Watch how real men go. Either u call the cops and they coming in both rooms." Tolson goaded, "lol yea ok." Mihokovich then warned, "[O]r my brothers bikes are slow. But we are going. To light it up. Tick tock. Thanks for the truck." Tolson replied that he did not have a truck and called Mihokovich a "[d]umb fuck." Mihokovich stated, "I am just courageous. Who comes first? Your police or my brothers." Tolson replied, "LOL." Mihokovich continued, "[Y]ou asked to Barrow three hundred for your lost game and thought you were going to get away with it lol. Y'all should just come out here

---

[1] Investigator Hazelwood explained that Mihokovich was referencing the Pagan motorcycle club of which his first cousin Todd Lewis was a member.

and beat my ass before they get here. Then your only in prison." Tolson replied, "I did get away with it. Thanks for the donation."

At 1:00 a.m., Mihokovich left the Econo Lodge and traveled to the Front Royal area. Around 3:00 a.m., Mihokovich returned to the Econo Lodge and parked next to a tan F-150 truck. Police officers later determined that the truck was driven by Mihokovich's first cousin, Todd Lewis. After a few minutes, Mihokovich drove across the street and parked in the Liberty gas station parking lot. Lewis then traveled to the Liberty gas station, backed into a space facing the Liberty gas station, and extinguished the truck's headlights.

Katelyn Jenkins and her husband were at the Liberty gas station at 3:00 a.m. on October 27, 2020. Initially, Jenkins remained in the vehicle while her husband went into the gas station to play a slot machine. When a Nissan pulled in beside Jenkins, she decided to enter the gas station. Jenkins saw that Mihokovich drove the Nissan, he was alone, and he appeared agitated while on the phone.

When Jenkins entered Liberty, her husband was seated at a slot machine next to Tolson. Jenkins sat in a booth behind the men. Moments later, Mihokovich entered the gas station. As Mihokovich approached the slot machines, Jenkins's husband got up and sat in the booth with Jenkins. Mihokovich sat at the recently vacated slot machine beside Tolson. The men began to banter but Jenkins could not hear their conversation.

Abruptly, Mihokovich left the store but returned minutes later. When Mihokovich and Tolson engaged in conversation again, it was heated. Tolson got out of his chair, and the pair began "hopping" around the store. When Tolson came to the store's front door, he exited and then ran across the parking lot; Mihokovich followed. From the front window of the store, Jenkins saw Mihokovich drive to the McDonald's across the street and "then it seemed like two cars pulled out from the McDonald's and went left."

"Dash camera" footage of the Liberty parking lot recorded Tolson running between the gas pumps. As Tolson crossed the parking lot, Lewis abruptly pulled his truck out of its parking spot and attempted to hit Tolson. Tolson dodged Lewis's truck and made his way towards the McDonald's; Lewis executed a wide turn and followed Tolson. Mihokovich, meanwhile, exited the Liberty station, entered his Nissan sedan, and raced after Lewis.

Surveillance footage from the Econo Lodge showed a figure run across the street as two vehicles—a truck and a sedan—followed. The truck moved past the McDonald's and executed a U-turn in a parking lot beside the Econo Lodge. The sedan, however, executed a U-turn near the McDonald's entrance. After the sedan completed its turn, flashes erupted from the driver's side window as it passed the McDonald's. Then, as the truck passed the McDonald's, more flashes appeared in the truck's driver's side window. Viewing the surveillance camera footage, Investigator Swartz opined that, in his training and experience, the flashes were muzzle flashes from a firearm. Investigator Hazelwood noted that the two spent cartridge casings were found in the area where the flashes occurred.

## II. Defense Presentation of Evidence

Victoria Keen, Mihokovich's aunt, and Angelic Ellis, Mihokovich's sister, testified on Mihokovich's behalf. The women testified that they saw Mihokovich at a funeral on October 27, 2020. Each noted that Mihokovich did not appear nervous, agitated, or afraid. Additionally, both Keen and Ellis noted that Mihokovich had poor eyesight requiring him to wear glasses and that he is right-handed. Ellis acknowledged that on October 27, 2020, she and her family members had discussed seeing photographs on Facebook of Mihokovich at the Liberty gas station around the time of Tolson's murder.

After Mihokovich rested, the Commonwealth declined to present rebuttal evidence. Mihokovich renewed his motion to strike the charges, which the trial court denied. The trial

court gave its instructions to the jury, and the parties delivered closing arguments. Because of the lateness of the hour, the trial court did not submit the case to the jury and ordered them to return the next morning.

When the parties returned the next morning, Mihokovich's trial counsel informed the trial court that Mihokovich wished to testify. Trial counsel noted that he was not making a motion to reopen the case but was simply informing the court of Mihokovich's desire.

Mihokovich asserted that he was under the impression that he would be testifying at trial. He claimed that his trial counsel told him that the prosecutor would be calling additional witnesses after him, and he perceived this as a threat. He asserted that the prosecutor was putting words in his mouth and that he wanted "to tell the jury why [he] did what [he] did and why [he] said what [he] said." He asserted that he had thought his sister would provide his explanation to the jury, but he wished to testify himself because she had not testified as he would have liked.

The trial court found that there was no motion to reopen the case before the court. To the extent that Mihokovich's request was a motion to reopen the case, the trial court denied it. After deliberation, the jury convicted Mihokovich of the second-degree murder and use of a firearm in commission of a murder.

### III. The Commonwealth's Motion *in Limine*

In a motion *in limine* before trial, the Commonwealth argued that a statement made several days before the murder by a man named "Josh" to Jeremy Avery, a clerk at the Liberty gas station, was inadmissible hearsay. In an interview with police, Avery stated that a week before Tolson's death he saw Tolson and Josh together at the Liberty gas station.[2] The encounter lasted for about an hour. Several hours later, Josh returned to Liberty and identified

---

[2] Josh's surname was never disclosed at trial.

himself to Avery as Josh.  Josh told Avery that he was looking for Tolson and that he "was going to kill" Tolson because Tolson had stolen money from Josh's wife.

The Commonwealth argued that Josh's statement was inadmissible hearsay and Mihokovich should be prohibited from mentioning this evidence in his opening statement and limit any testimony by Avery to anything he may have observed.  At the hearing on the motion, Mihokovich acknowledged that any testimony about Josh's statement was hearsay and agreed that the trial court could limit the introduction of that statement.  In fact, Mihokovich asserted that he was not seeking to introduce that statement and instead wished to question the investigators about the leads they followed.  Later, however, Mihokovich asserted that Josh's statement was relevant because it was a threat made several days before Tolson's murder; he also claimed that he was not offering the statement for the truth of the matter asserted.  The trial court disagreed, found that the statement was inadmissible hearsay, and granted the Commonwealth's motion *in limine*.

### IV.  Jury Voir Dire

During the COVID-19 pandemic the Circuit Court of Frederick County conducted juror voir dire away from the courthouse in the Public Safety Building.  Jurors were questioned as a group in a large room, and a smaller room—the kitchen—was used to discuss topics outside the presence of the prospective jurors.

On June 12, 2022, the day before trial, Mihokovich was exposed to COVID-19.  Before voir dire began, while in the kitchen, the trial court and counsel discussed the implications of Mihokovich's exposure.[3]  During these discussions, Mihokovich was not present in the kitchen but was in another part of the building.  The trial court and counsel agreed that the jury would be

---

[3] The record is clear that the kitchen was small.  Neither Mihokovich nor his trial counsel wished to wear a mask, and Mihokovich's trial counsel was concerned about contracting COVID-19.

selected but not sworn and that trial would commence on Wednesday, June 15, 2022, to ensure Mihokovich's exposure to COVID-19 had not resulted in his contraction of the virus.

Mihokovich was present while prospective jurors were questioned in a larger room. After questioning jurors, the trial court, Mihokovich's trial counsel, and the prosecutor moved to the kitchen. Mihokovich remained in the large room with the prospective jurors. In the kitchen, Mihokovich's trial counsel indicated that Mihokovich had waived his right to be present in the kitchen and the attorneys raised their motions to strike particular jurors for cause.

In the meantime, a deputy advised the trial court that Mihokovich had loudly referenced winning a motion in front of the venire. The trial court instructed the deputy to remove Mihokovich from the venire's presence. Mihokovich's trial counsel indicated that he did "not think we need [Mihokovich] anymore." The trial court asked Mihokovich's trial counsel if he was "suggesting that we do not even need him here anymore." Counsel stated, "I do not think we need to sit him around, you know, when we are doing our strikes. I am not going to ask him for his opinion on it." Consequently, Mihokovich was returned to a holding cell and then the regional jail.

After completing the strikes for cause, the trial court and counsel returned to the large room for peremptory strikes. After peremptory strikes, the trial court discharged the jurors who had been struck and informed the selected prospective jurors that trial would commence on June 15, 2022.

Before trial on June 15, 2022, the trial court conducted a colloquy with Mihokovich. The court explained the juror selection process during the COVID-19 pandemic and noted that during juror strikes Mihokovich was not physically present. The court also noted that Mihokovich's trial counsel had indicated on Monday, June 13, 2022, that Mihokovich had waived his right to be present during for cause and peremptory strikes at voir dire. The court expressed its desire to

ensure "that [the waiver] is something that [Mihokovich] discussed with [his] lawyer" and that the waiver was "something that [he] personally waived rather than something simply waived by [his] lawyer."

The court specifically asked Mihokovich, "Did you waive your right to be physically present during this selection process?" Mihokovich stated "[Y]es, your honor." The court then explained peremptory strikes to Mihokovich and asked if he had waived his right to be physically present while the attorneys made those strikes. The court noted that before answering Mihokovich was free to confer with his trial counsel if he wished. Mihokovich stated, "no, I understand," and that "yes" he had waived his right to be physically present during peremptory strikes.

V. Post-Trial Hearing on the Motion to Set Aside the Verdict

After his conviction, Mihokovich moved to set aside the verdict. At a hearing on the motion, Mihokovich's trial counsel testified that he advised Mihokovich of his right to be present during juror strikes and explained that it was an important part of trial. Trial counsel asserted that after conducing voir dire, he told Mihokovich why he was going to the kitchen without him—to conduct for cause strikes. In response, Mihokovich stated that he was "fine with that."

Regarding Mihokovich's right to testify at trial, counsel attested that before trial he and Mihokovich had discussed whether it was advisable for Mihokovich to testify in his own defense. Counsel recommended that Mihokovich not testify; Mihokovich indicated he agreed with that recommendation. After counsel presented three defense witnesses but before he rested, Mihokovich asserted that he wanted to testify. Again, counsel recommended that Mihokovich not testify but clarified that it was Mihokovich's right and choice to do so. After this discussion, Mihokovich changed his mind again and stated, "I don't want to testify." It was not until the next morning, after the close of evidence, that Mihokovich expressed his desire to testify.

- 9 -

Mihokovich testified at the hearing that he was present in a large room while prospective jurors were questioned and remained in the large room when the trial court, his trial counsel, and the prosecutor went into the kitchen. He contended that his trial counsel never told him why the attorneys were going into the kitchen. Additionally, he claimed that he was never told why he was removed to a holding cell while the trial court and attorneys were in the kitchen. Mihokovich asserted that he did not consent to his trial counsel picking the jury without him and claimed that he had a list of prospective jurors that he planned to talk to his attorney about. In jail calls to his family after the jury was selected, Mihokovich mentioned that his trial counsel did not let him stay in the room when they picked the jury.

Mihokovich acknowledged that he had engaged in a colloquy with the trial court regarding whether he had waived his right to be physically present during juror strikes. Mihokovich claimed that he tried to talk to his trial counsel about the court's questions and his absence for jury selection, but his trial counsel became agitated and told Mihokovich to say "yeah." Consequently, Mihokovich did as his counsel instructed. When asked why he said yes, Mihokovich stated that had paid his attorney, he trusted his attorney, and that the complaint was "spilt milk."

Concerning his right to testify at trial, Mihokovich acknowledged that before trial he and his trial counsel had discussed whether he should testify. Mihokovich claimed that he continuously asserted his desire to testify. Each time, however, his trial counsel would get agitated with him, cuss at him, and assert that he was the person with the law degree.

After argument from counsel, the court found Mihokovich's testimony to be incredible. The court noted that it was physically present in the courtroom during the colloquy and that the court did not recall "the violent body language that Mr. Mihokovich testified to" regarding trial counsel's behavior. The court noted that it explained peremptory strikes to Mihokovich and told

him that he could confer with his counsel. In response, Mihokovich had indicated that he understood what the court was discussing with him and that he had waived his right to be physically present during the entirety of voir dire. Based on its observations of Mihokovich's demeanor while testifying at the motion and on June 15, 2022, the trial court denied Mihokovich's motion to set aside the verdict on the basis of not being present during voir dire.

The court noted that there was little argument regarding the second part of the motion— inability to testify. The court, without explanation, denied the motion to set aside the verdict on that basis as well.[4] The trial court sentenced Mihokovich to 43 years of incarceration, with all but 21 years and 6 months suspended. Mihokovich appeals.

ANALYSIS

I. Motion *in Limine*

On appeal, Mihokovich argues that the trial court erred when it refused to admit testimony about the statement that Josh made to Avery. Mihokovich contends that Josh's statement was not offered for the truth of the matter asserted but rather "to explain why Jeremy Avery contacted the police, and what investigation, if any, the police undertook."

"It is well-settled that '[d]ecisions regarding the admissibility of evidence lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion.'" *Nottingham v. Commonwealth*, 73 Va. App. 221, 231 (2021) (alteration in original) (quoting *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019)). "A court has abused its discretion if its decision was affected by an error of law or was one with which no reasonable jurist could agree." *Tomlin v. Commonwealth*, 74 Va. App. 392, 409 (2022).

---

[4] The trial court noted that it "was not just making a procedural ruling based on no Motion being made." The court asserted that it considered Mihokovich's request but denied it for the reasons stated in the record.

"Hearsay is 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'" *Atkins v. Commonwealth*, 68 Va. App. 1, 8 (2017) (quoting Va. R. Evid. 2:801(c)). Hearsay evidence "'is inadmissible unless it falls within one of the recognized exceptions' to the rule against hearsay." *Id.* at 7-8 (quoting *Robinson v. Commonwealth*, 258 Va. 3, 6 (1999)).

Unless otherwise prohibited, "[a]ll relevant evidence is admissible[.]" Va. R. Evid. 2:401(a). "'Relevant evidence' means evidence having any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence." Va. R. Evid. 2:401. "The scope of relevant evidence in Virginia is quite broad, as '[e]very fact, however remote or insignificant, that tends to establish the probability or improbability of a fact in issue is relevant.'" *Commonwealth v. Proffitt*, 292 Va. 626, 634 (2016) (alteration in original) (quoting *Virginia Elec. & Power Co. v. Dungee*, 258 Va. 235, 260 (1999)).

The challenged statement was relevant only if it was offered for the truth of the matter asserted—that Josh killed Tolson. If the challenged statement was not offered for the truth of the matter asserted, then the statement was irrelevant as it did not tend to establish that someone other than Mihokovich killed Tolson. Consequently, the trial court did not abuse its discretion in granting the Commonwealth's motion *in limine* and excluding testimony about Josh's statement as inadmissible hearsay.

## II. Sufficiency of the Evidence

Mihokovich argues that the evidence was insufficient to prove he murdered Tolson. "When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself

whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

Mihokovich argues that there was "no direct evidence tying him to the offenses" and the evidence failed to exclude his hypothesis of innocence—someone else killed Tolson. He notes that there was no forensic evidence or eyewitness who observed the shooting. Further, Tolson "was a drug dealer who cheated people" and multiple threatening voice mails from someone other than Mihokovich were found on Tolson's phone. Additionally, when police first arrived an individual was seen rapidly walking away. Mihokovich asserts that if he intended to shoot Tolson, he would have concealed his identity by wearing a mask which was common during the COVID-19 pandemic. He further contends that the flashes seen from his vehicle could have been from brake lights. Hours after Tolson's murder, two witnesses observed him at a funeral and testified that he "did not appear nervous, agitated, or afraid." These witnesses also noted that Mihokovich had poor eyesight and was right-handed which, he argues, undermines the Commonwealth's theory that he shot Tolson with his left hand from a moving vehicle. Thus, Mihokovich asserts, the jury could only have reached a guilty verdict if it engaged in speculation.

Second-degree murder "is defined as a malicious killing." *Woods v. Commonwealth*, 66 Va. App. 123, 131 (2016). "In order for an act to be done maliciously, the act must be done

'wilfully or purposefully.'" *Id.* (quoting *Essex v. Commonwealth*, 228 Va. 273, 280 (1984)). "Malice is evidenced either when the accused acted with a sedate, deliberate mind, and formed design, or committed any purposeful and cruel act without any or without great provocation." *Id.* (quoting *Branch v. Commonwealth*, 14 Va. App. 836, 841 (1992)). "It shall be unlawful for any person to use . . . a pistol, shotgun, rifle, or other firearm . . . while committing or attempting to commit murder." Code § 18.2-53.1.

"It is firmly established that '[c]ircumstantial evidence is competent and is entitled to as much weight as direct evidence provided that the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt.'" *Kelley v. Commonwealth*, 69 Va. App. 617, 629 (2019) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "Circumstantial evidence is not 'viewed in isolation' because the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable [fact finder]' to conclude beyond a reasonable doubt that a defendant is guilty." *Rams v. Commonwealth*, 70 Va. App. 12, 27 (2019) (alteration in original) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005)).

"The sole responsibility to determine the credibility of witnesses, the weight to be given to their testimony, and the inferences to be drawn from proven facts lies with the fact finder." *Blankenship v. Commonwealth*, 71 Va. App. 608, 619 (2020) (quoting *Ragland v. Commonwealth*, 67 Va. App. 519, 529-30 (2017)). "This deferential principle applies not only to 'matters of witness credibility' but also to the factfinder's 'interpretation of all of the evidence, including video evidence' presented at trial." *Barney v. Commonwealth*, 302 Va. 84, 97 (2023) (quoting *Meade v. Commonwealth*, 74 Va. App. 796, 806 (2022)). "The factfinder 'views video and other evidence to determine what it believes happened; we, on appellate review, view video evidence not to determine what we think happened, but for the limited purpose of determining

whether any rational factfinder could have viewed it as the [factfinder] did.'" *Id.* (alteration in original).

"[M]erely because [a] defendant's theory of the case differs from that taken by the Commonwealth does not mean that every reasonable hypothesis consistent with his innocence has not been excluded. What weight should be given evidence is a matter for the [factfinder] to decide." *Edwards v. Commonwealth*, 68 Va. App. 284, 301 (2017) (second and third alterations in original) (quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 9 (2004)). "By finding [a] defendant guilty, therefore, the factfinder 'has found by a process of elimination that the evidence does not contain a reasonable theory of innocence.'" *Id.* (alteration in original) (quoting *Haskins*, 44 Va. App. at 9). "While a factfinder may not arbitrarily disregard a reasonable doubt, whether 'the hypothesis of innocence is reasonable is itself a "question of fact," subject to deferential appellate review.'" *Burton v. Commonwealth*, 58 Va. App. 274, 285-86 (2011) (quoting *Clanton v. Commonwealth*, 53 Va. App. 561, 572-73 (2009) (en banc)).

Here, the evidence was sufficient to prove that Mihokovich shot and killed Tolson. Jenkins saw Tolson at a slot machine in the Liberty gas station when Mihokovich entered. Mihokovich approached Tolson, the pair bantered, and Mihokovich left. Minutes later Mihokovich returned to the slot machines, and he and Tolson got into a heated argument. The pair got up from the slot machines and began walking around the store as they continued to argue. Suddenly, Tolson bolted out of the front door.

Cameras operating in the gas station parking lot captured Tolson running from the store through the lot. As Tolson ran, he was nearly hit by Lewis in a tan F-150 truck. Tolson dodged Lewis and continued his flight in the direction of the McDonald's and the Econo Lodge across the street. Both Lewis and Mihokovich raced after Tolson in their vehicles.

Video footage from the Econo Lodge shows a figure run across the street as two vehicles—a truck and a sedan—follow in pursuit. The truck passed the McDonald's and executed a U-turn in a parking lot next to the Econo Lodge, but the sedan turned around near the McDonald's entrance. Immediately, muzzle flashes appeared in the sedan's driver's window. After the truck pulled in behind the sedan, several more muzzle flashes appeared in the truck's driver's window. Two .44 caliber cartridge casings were discovered near the McDonald's entrance, the location where both vehicles had stopped when muzzle flashes erupted. Tolson, who suffered gunshot wounds to his head, lay dead near the spent casings in the McDonald's parking lot.

Text messages between Mihokovich and Tolson established that the pair had discussed a drug deal in the hours before Tolson's death. Based on Tolson's conversations with others, Tolson planned to cheat Mihokovich. Eventually, Mihokovich realized that Tolson did not plan to uphold his end of the agreement, threatened to have his friends find Tolson, and inferred that his friends would go to jail for what they would do to Tolson. Although this evidence is largely circumstantial, it paints a clear picture of the events of that night, and is competent for a jury to determine the facts. Given the totality and overwhelming nature of the evidence, and given the unchallenged Jury Instruction #8 covering concert of action, a reasonable fact finder could conclude beyond a reasonable doubt that Mihokovich was guilty of the shooting and killing of Tolson.

### III. Motion to Set Aside the Verdict

Mihokovich argues that the trial court erred when it denied his motion to set aside the verdict. This Court reviews the denial of a motion to set aside the verdict and grant a new trial for abuse of discretion, because "[t]he opportunity and temptation for fraud which accompany a motion for a new trial require that such a motion be approached guardedly." *Whittington v.*

*Commonwealth*, 5 Va. App. 212, 215 (1987). "The abuse of discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions." *Porter v. Commonwealth*, 276 Va. 203, 260 (2008) (quoting *Koon v. United States*, 518 U.S. 81, 100 (1996)). "Only when reasonable jurists could not differ can [this Court] say an abuse of discretion has occurred." *Lambert v. Commonwealth*, 70 Va. App. 740, 749 (2019) (quoting *Thomas v. Commonwealth*, 44 Va. App. 741, 753, *adopted on reh'g en banc*, 45 Va. App. 811 (2005)). "[C]onstitutional arguments are questions of law that [the Court] review[s] de novo." *Shivaee v. Commonwealth*, 270 Va. 112, 119 (2005).

Mihokovich advances two arguments concerning the trial court's denial of his motion to set aside the verdict. First, he argues that his due process rights and his right under Code § 19.2-259 to be physically present to aid his trial counsel during voir dire were violated. Second, he argues that his due process rights and his right under Code § 19.2-268 to testify at trial were violated. We will address each in turn.

## A. Presence During Jury Voir Dire

Mihokovich argues that his trial attorney "never advised [him of] what was occurring in the small kitchen" and that he "never consented to being left out." He also contends that any conceivable waiver was not knowingly and voluntarily made but rather "was the result of undue influence by [his trial counsel] and being uninformed."

Under Code § 19.2-259, "[a] person tried for felony shall be personally present during the trial." "This provision is 'merely declaratory of a principle of the common law;' it is 'an essential part of the process of law . . . .'" *Bilokur v. Commonwealth*, 221 Va. 467, 469 (1980) (quoting *Noell v. Commonwealth*, 135 Va. 600, 608-09 (1923)). The statutory phrase "during the trial" has been defined as "every stage of the trial from [the accused's] arraignment to his sentence, when anything is to be done which can affect his interest." *Palmer v. Commonwealth*,

143 Va. 592, 605 (1925). "The Sixth Amendment of the United States Constitution also protects the right of the accused to be present." *Nunez v. Commonwealth*, 66 Va. App. 152, 156 (2016); *see Illinois v. Allen*, 397 U.S. 337, 338 (1970). "A defendant can forfeit his right to be present if he voluntarily absents himself from trial." *Id.*; *see Cruz v. Commonwealth*, 24 Va. App. 454, 464 (1997). To constitute a waiver of the right to be present, a defendant's absence must result from "a voluntary, knowing, and intelligent act 'done with sufficient awareness of the relevant circumstances and likely consequences.'" *Cruz*, 24 Va. App. at 461 (quoting *Hunter v. Commonwealth*, 13 Va. App. 187, 191 (1991)).

Here, the trial court engaged Mihokovich in a colloquy when the parties reconvened for trial. The court explained to Mihokovich that he had a right to be present throughout voir dire including during juror strikes. The court noted that Mihokovich had not been physically present during for cause and peremptory strikes and that his trial counsel had stated Mihokovich had waived his right to be present. The court, nevertheless, specifically asked Mihokovich if *he* had waived his right to be present during juror strikes or if the waiver had only come from his attorney. Mihokovich responded that he understood the trial court's inquiry and that he had waived his right to be present during juror strikes. Based on this colloquy, the trial court reasonably concluded that Mihokovich knowingly and voluntarily waived his right to be present during voir dire. Thus, the trial court did not err when it denied Mihokovich's motion to set aside the verdict on this ground.

Furthermore, Mihokovich cannot now claim that his attorney forced him to waive his right to be present during the entirety of voir dire or that he did not understand the trial court's inquiry because, before trial, he affirmed that he understood the court's inquiry and that he personally waived his right to be present during the entirety of voir dire. "A party may not approbate and reprobate by taking successive positions in the course of litigation that are either

inconsistent with each other or mutually contradictory."  *Rowe v. Commonwealth*, 277 Va. 495,

502 (2009) (quoting *Cangiano v. LSH Bldg. Co.*, 271 Va. 171, 181 (2006)).  "Nor may a party

invite error and then attempt to take advantage of the situation created by his own wrong."  *Id.*

### B.  Right to Testify

Mihokovich asserts that the trial court abused its discretion in denying his motion to set

aside the verdict because his trial counsel prevented him from exercising his right to testify and

that his trial counsel's testimony at the motion to set aside the verdict was incredible.

A criminal defendant has a constitutional right to testify in his own behalf.  *Rock v.*

*Arkansas*, 483 U.S. 44, 49 (1987).  The right is a personal one, and therefore, "the accused has

the ultimate authority to make certain fundamental decisions regarding the case, as to whether to

plead guilty, waive a jury, *testify in his or her own behalf*, or take an appeal . . . ."  *Jones v.*

*Barnes*, 463 U.S. 745, 751 (1983) (emphasis added).

"With few exceptions, most legal rights—whether common law, statutory, or

constitutional—can be waived if the requisite formalities are observed."  *Congdon v.*

*Commonwealth*, 57 Va. App. 692, 695 (2011).  "In the 'context of a broad array of constitutional

and statutory provisions,' courts have 'articulated a general rule that presumes the availability of

waiver, . . . and we have recognized that "the most basic rights of criminal defendants"' can be

waived."  *Id.* (quoting *New York v. Hill*, 528 U.S. 110, 114 (2000)).  "These rights may be as

venerated as the right to a jury, the right to counsel, the right against self-incrimination, and the

right to exclusion of evidence seized in an unconstitutional manner."  *Id.* (quoting *Muhammad*,

269 Va. at 507).

Some waivers can be implied.  For example, *Miranda*[5] rights can be lost by an "implied

waiver" just as effectively as by an express one.  *Berghuis v. Thompkins*, 560 U.S. 370, 384

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

(2010). A plethora of constitutional trial rights can be implicitly waived simply by failing to timely assert them at trial. *See, e.g.*, *Vermont v. Brillon*, 556 U.S. 81 (2009) (applying "standard waiver doctrine" to the constitutional right to a speedy trial); *Taylor v. United States*, 414 U.S. 17, 19 (1973) (holding confrontation rights can be implicitly waived). Other rights must be expressly waived. *See, e.g.*, *McCarthy v. United States*, 394 U.S. 459, 466 (1969) (waiving a full evidentiary trial pursuant to a guilty plea); *Johnson v. Zerbst*, 304 U.S. 458, 464-65 (1938) (waiving the right to counsel). "What suffices for waiver depends on the nature of the right at issue." *Hill*, 528 U.S. at 114. Though the required form of the waiver varies from right to right, the legal efficacy of the waiver remains a constant.

In *Vay v. Commonwealth*, 67 Va. App. 236, 246 (2017), the trial court asked the defendant's counsel if he had discussed Vay's right to testify. Vay's counsel noted that he and the defendant had discussed it. *Id.* The trial court then inquired whether Vay intended to exercise his right to testify. *Id.* Vay's counsel stated that he believed so but that he would discuss it with Vay again. *Id.* Vay was present in the courtroom during this exchange. *Id.* After a recess, Vay's counsel moved to strike the charge, which the trial court denied. *Id.* at 246-47. Vay called one witness and rested his case. *Id.* at 247. Vay did not testify and was ultimately convicted. *Id.* At a post-trial hearing, Vay indicated that he wanted to testify but did not because his counsel had advised him against it. *Id.* The trial court imposed the jury's verdict. *Id.* at 248.

On appeal, Vay argued that the trial court had erred in denying his constitutional right to testify on his own behalf by failing to conduct a voir dire to establish whether he knowingly and intelligently waived his right. *Id.* at 258. We noted that "nothing in the text of the Constitution even suggests that such a colloquy is necessary" and reasoned that "requiring the colloquy has the potential to do at least as much harm as good." *Id.* at 259. Consequently, we held that a trial

- 20 -

court need not conduct a colloquy with a defendant to determine whether he has knowingly and intelligently waived his right to testify. *Id.*

The record clearly establishes that Mihokovich was aware of his right to testify as he admitted that he discussed this right with his trial counsel on several occasions before trial. At trial, Mihokovich chose to present evidence at the conclusion of the Commonwealth's case-in-chief. Mihokovich's trial counsel admitted that Mihokovich raised the possibility of testifying before the defense rested but ultimately changed his mind after further consultation with counsel. After resting, Mihokovich renewed his motion to strike the Commonwealth's evidence, which the trial court denied. The parties then discussed jury instructions with the trial court, the court instructed the jury, and attorneys presented closing arguments.

At no point during these proceedings did Mihokovich indicate that he wished to exercise his constitutional right to testify. It was fair for the trial court to conclude, based on Mihokovich's acquiescence, that he approved of proceeding without testifying. Further, it was in the court's purview, as the finder of fact at the motion to set aside the verdict, to believe trial counsel's version of events rather than Mihokovich's. Thus, the trial court did not abuse its discretion in denying Mihokovich's motion to set aside the verdict.[6]

### CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.

*Affirmed.*

---

[6] To the extent that Mihokovich's assignment of error alleges that his trial counsel's actions deprived him of effective assistance of counsel, such arguments are not cognizable on direct appeal and we do not consider them. *See Vay*, 67 Va. App. at 260; *Lenz v. Commonwealth*, 261 Va. 451, 460 (2001).